In re HURRICANE ELKHORN COAL CORPORATION II.

FIRST NATIONAL BANK OF LOUISVILLE, Plaintiff,

v.

HURRICANE ELKHORN COAL CORPORATION II, Defendant and Cross-Plaintiff,

and

Logan and Kanawha Coal Company, Inc., Defendant and Cross-Defendant.

Bankruptcy No. 3–81–00203.
Adv. No. 3–81–0181.

United States Bankruptcy Court,
W. D. Kentucky.

April 28, 1982.

James G. Apple, Louisville, Ky., James W. Halloran, Cincinnati, Ohio, for Logan & Kanawha.

John P. Reisz, Louisville, Ky., for Hurricane Elkhorn.

David T. Stosberg, Louisville, Ky., for First National.

## MEMORANDUM AND ORDER

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

This is the third extensive opinion to be generated by the Chapter 11 reorganization effort of Hurricane Elkhorn Coal Corporation, a coal mining company. The First National Bank of Louisville has been a lender to Hurricane Elkhorn and the assignee of Hurricane Elkhorn's accounts receivable. Logan and Kanawha Coal Company, Inc. ("Logan-Kanawha"), at the time this dispute developed, was the agent of Hurricane Elkhorn and the conduit through which payments were made for the coal. This action stems from events occurring before and after Hurricane Elkhorn filed for Chapter 11 relief on February 2, 1981.

Hurricane Elkhorn supplied coal to two utility companies, the Cincinnati Gas and Electric Company, and Consumers Power Company, a Michigan utility. By agreement of all parties, those utilities would remit payment for the coal directly to Logan-Kanawha, which would deduct its 4% agent's commission and forward the balance of the payment to First National, the assignee of Hurricane Elkhorn's accounts receivable. In several transactions beginning about a year before the filing of this petition, Logan-Kanawha inadvertently overpaid First National a total of $84,-652.60. About a month after Hurricane Elkhorn filed its petition, Logan-Kanawha discovered its previous overpayments and withheld $84,652.60 it was to have paid First National.

First National and Hurricane Elkhorn allege[1] that by withholding that amount Logan-Kanawha violated the automatic stay of § 362. Hurricane Elkhorn seeks an order requiring Logan-Kanawha to turn over the withheld funds, and also a contempt rule against Logan-Kanawha for the alleged unlawful setoff.

Logan-Kanawha counters on two grounds; first, that under the doctrine of restitution the mistakenly overpaid funds belong to it and never became Hurricane Elkhorn's property; and second, that the accounts receivable from which it withheld payment are not estate property, but are instead the property of First National as assignee.

Logan-Kanawha thus raises a threshold question of whether this court has jurisdiction over the property involved in this suit.

\* \* \*

On March 28th and 29th of 1979 the three parties to this action completed a loan package that would control their course of dealing beyond the date on which Hurricane Elkhorn filed its bankruptcy petition.[2] The key contract was the basic loan agreement between Hurricane Elkhorn and First National, which provided for advances to Hurricane Elkhorn up to a stated maximum.[3]

---

1. This adversary action was initially brought by First National against Hurricane Elkhorn and Logan-Kanawha. Hurricane Elkhorn cross-claimed against Logan-Kanawha, reciting substantially the same claim asserted by First National. Hurricane Elkhorn has since taken the lead in the prosecution of this action, and its position is now practically indistinguishable from First National's position.

2. Both Hurricane Elkhorn and Logan-Kanawha have in their briefs explored ably and at some length the workings of the various instruments executed as part of the loan package of March 28th. We have simplified considerably our version of the mechanics of those agreements, however, to focus on the issues directly at hand.

3. The aggregate of advances was not to exceed the lesser of (a) 80% of the face value of

The loan procedure provided that with each request for an advance, Hurricane Elkhorn would submit an assignment of receivables form to which were attached shipping documents reflecting the quantity and quality of coal shipped to the utility buyers. The advances were based on Hurricane Elkhorn's current accounts receivable from sales of coal.

The form used by the parties listed the specific receivables assigned for each advance, but a separate agreement labeled "Assignment" generally described the terms and conditions of Hurricane. Elkhorn's assignment to First National. That agreement provided for the assignment of *all* amounts that would later be due and owing from Logan-Kanawha.

Under the "Assignment," Logan-Kanawha, and not the utilities buying the coal, became Hurricane Elkhorn's debtor. The utilities were to pay Logan-Kanawha direct for Hurricane Elkhorn's coal. An agency agreement between Hurricane Elkhorn and Logan-Kanawha required that after deducting its commission, Logan-Kanawha would remit the balance to either Hurricane Elkhorn or its designee, which in this case was First National.

Logan-Kanawha was formally notified that First National was Hurricane Elkhorn's assignee by a "Notice of Assignment and Irrevocable Direction to Pay." That document, as well as a "Security Agreement," irrevocably authorized and directed Logan-Kanawha, as Hurricane Elkhorn's account debtor, to pay First National what it owed or would come to owe Hurricane Elkhorn.

All parties have performed in accordance with the various instruments executed on March 28th and 29th of 1979. Pursuant to its loan agreement with First National, Hurricane Elkhorn submitted the appropriate assignment form each time it requested an advance from First National, which was upon every coal shipment. Within a day of each request, First National would make advances by transferring to Hurricane Elkhorn's operating account 80% of the value of the receivables generated by the sales.

Consistent with the terms of the coal supply agreement, after the coal reached its destination the utility company would immediately pay Logan-Kanawha 75% of the coal price. It would pay the balance after it determined the coal met contract specifications. Logan-Kanawha would exact its commission and send the balance to First National by check payable to "First National Bank of Louisville-Assignee, Hurricane Elkhorn Coal Corporation II."

When First National received payment, it would deposit the funds in Hurricane Elkhorn's operating account, and debit the account to reduce Hurricane Elkhorn's loan balance. The money that was not applied to the loan was available to Hurricane Elkhorn in its operating account. That account was the same one into which First National put advances, and it was Hurricane Elkhorn's source of working capital.

On the date Hurricane Elkhorn filed its petition, February 2, 1981, this court approved an agreed order between First National and Hurricane Elkhorn providing "that the debtor continue its accounts receivable financing arrangement with the First National Bank of Louisville and that the debtor be allowed to execute a new security agreement on the accounts receivable of the debtor." The agreed order also authorized Hurricane Elkhorn's use of its cash collateral.

Hurricane Elkhorn and First National executed a security agreement that day. Five days later the bank filed a financing statement covering "all accounts receivable and inventory as per all Loan and Security Agreements between Debtor and Secured Parties."

Business continued as usual after the filing, and on February 24, 25, 28 and March 3, 1981, Hurricane Elkhorn shipped coal by barge to the Cincinnati Gas and Electric Company. Upon receiving the coal, CG&E paid Logan-Kanawha. First National was in turn to have been paid $157,609.95; but

Hurricane Elkhorn's accounts receivable, or (b) $1,800,000.

Logan-Kanawha had discovered after the petition was filed, that in several pre-petition transactions[4] it had overpaid First National by $84,652.60. Logan-Kanawha therefore tendered a check dated March 19, for only $74,957.05 to "First National Bank of Louisville-Assignee of Hurricane Elkhorn Coal Corporation II."

The basis for this action is Logan-Kanawha's refusal to remit the full amount it owes on its post-petition indebtedness to Hurricane Elkhorn.

\* \* \*

Logan-Kanawha argues first that the money it erroneously overpaid remained at all times its property and never became the property of Hurricane Elkhorn. It relies on the law of restitution, which generally entitles a party to recover money it pays to another under a mistake of fact, and quotes the following passage from *Am.Jur.2d* on the law of restitution: "The ground on which the rule [requiring repayment of mistakenly paid money] rests is that money paid through misapprehension of facts belongs, in equity and good conscience, to the person who paid it."[5] From that statement and other legal authority, Logan-Kanawha concludes that it is more than simply a creditor of Hurricane Elkhorn; it concludes that it is the beneficiary of a trust fund consisting of the money it had mistakenly overpaid.

■ Logan-Kanawha has not specified the type of trust it seeks to have impressed on the mistakenly paid funds, but it appears that these facts could cause to be created only an equitable or constructive trust, if any trust at all. Bankruptcy law recog-

nizes that money paid to a debtor under a mistake of fact is impressed with a constructive trust that follows it into the hands of the estate.[6] But as with all trusts in bankruptcy, the trust property must be identified in its original or substituted form;[7] the trust must be traceable. As two recent cases have held, it is not enough for the purported beneficiary of a constructive trust to assert wrongful retention of money or unjust enrichment without also identifying a specific trust res.

*In Matter of Kennedy & Cohen, Inc.,*[8] the Fifth Circuit declined to impress a constructive trust on specific assets of a bankrupt's estate that were not identifiable or traceable as the property the bankrupt was purported to have wrongfully retained. The court observed that although state law might not require the identification of a trust res, federal bankruptcy law does. The court followed *United States v. Randall*[9] in holding that because federal law prevailed, no trust had been created.

*Rosenberg v. Collins,*[10] likewise adhered to the rule that a constructive trust attaches to property only when the property can be identified and traced, with the burden of tracing to rest upon the person claiming the benefit of the trust.[11]

■ Logan-Kanawha has offered no evidence that the money it erroneously overpaid the debtor-in-possession was still in the debtor's hands at the time it filed bankruptcy. Its argument for a constructive trust is negatived by its failure to identify what portions of the debtor-in-possession's assets

---

4. Several overpayments were made during 1980, but the three most substantial were made on April 21, 1980, for $90,000; June 20, 1980, for $24,400; and August 6, 1980, for $3,300. With some minor subsequent adjustments and Logan-Kanawha's application of a $33,560.30 credit, the overpayment as it stands now amounts to $84,652.60.

5. 66 *Am.Jur.2d* Restitution and Implied Contracts § 119, citing *United States v. Carr*, 132 U.S. 644, 10 S.Ct. 182, 33 L.Ed. 483 (1890).

6. 4 *Collier on Bankruptcy* ¶ 541.13 (15th ed. 1979).

7. Id.

8. 612 F.2d 963 (5th Cir. 1980).

9. 401 U.S. 513, 91 S.Ct. 991, 28 L.Ed.2d 273 (1971).

10. 624 F.2d 659 (5th Cir. 1980).

11. *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924).

should be impressed with a constructive trust, and its failure to offer proof that there exists a trust res to which it can lay claim.

What is more important, the property impressed with a constructive trust should be, in theory at least, the same property that was mistakenly given. Logan-Kanawha's attempt to retain $84,652.60 on a constructive trust theory is not consistent with that basic requirement. If a constructive trust were to attach, it would attach to money in Hurricane Elkhorn's account at the time Hurricane Elkhorn filed bankruptcy. It could not attach to money due but not yet paid into the estate.[12]

We therefore reject Logan-Kanawha's argument that under the law of restitution it should be accorded the status of a beneficiary of a trust rather than that of a common creditor. Logan-Kanawha has not traced its overpayments to any portion of the estate assets, and cannot now assert a constructive trust in property that is not part of the overpaid funds.

## II.

Logan-Kanawha's argument that the debtor's estate has no interest in its receivables because it assigned them to First National strikes closer to the question of entitlement to the account proceeds. Logan-Kanawha points for support to the wording of the assignment instruments. In the assignment of receivables form, Hurricane Elkhorn "sells, conveys and assigns," and again in the general assignment it "transfers, sets over, and assigns" its accounts receivable to First National. It also "irrevocably authorizes and directs" Logan-Kanawha to pay First National in a notice of assignment sent to Logan-Kanawha. Upon these seemingly unequivocal expressions, Logan-Kanawha bases its claim that Hurricane Elkhorn absolutely divorced itself, and

thus its estate, of any interest in its accounts receivable.

Hurricane Elkhorn posits, however, that the assignment was merely part of an accounts receivable financing arrangement; that First National has no more than a security interest in the accounts; and that because the accounts are only security for a loan, the estate has retained some interest in them. Hurricane Elkhorn also asserts that Logan-Kanawha has confused this assignment as a security device with an assignment as a sale, reciting as support the wording of the assignment instruments to the effect that the assignment is made as security for the loan from First National.

Whether the assignment of accounts is characterized as an absolute and irrevocable assignment, much in the nature of a sale, or as a security device, the ultimate question is whether the estate has any interest in the proceeds from the assigned accounts.

It has been held that an estate has no interest in such proceeds. In *In re Bargstedt*,[13] the trustee in bankruptcy claimed as estate property a post-petition payment of $4,100 paid to the assignee of money owed the debtor from the sale of milk. The Court succinctly identified the issue when it wrote:

> If the $4,100 was property of the debtor and the action of the defendant was the collection of a debt subsequent to the filing of the petition in bankruptcy, the provisions of Bankruptcy Code §§ 362, 541 and 542 would make the money a part of the estate and recoverable by the trustee. If the $4,100 was not property of the debtor, then the trustee has no right to it.[14]

The court determined that under Georgia law the assignment was legal and valid. It concluded that because the debtor could not have claimed title to the proceeds, neither could the trustee in bankruptcy. The as-

---

12. See generally the discussion in 4 *Collier on Bankruptcy*, ¶ 541.13, at 541–69 (15th Ed. 1979).

13. 7 B.R. 556 (Bkrtcy.M.D.Ga.1980).

14. Id. at 557.

signment caused the proceeds not to pass into the debtor's estate.

Likewise, in *Dannerbeck v. Palmer*[15] the Ninth Circuit held that because the bankrupt effectively assigned contract proceeds to its creditor before bankruptcy, on the date of bankruptcy the bankrupt had no property interest in the proceeds that could vest in the trustee under § 70(a) of the Bankruptcy Act. The bankrupt, a contractor, assigned improvement bonds that were to be issued when it completed its contracts. Its purpose was to obtain additional financing for completion of various projects.

Both the *Dannerbeck* and *Bargstedt* courts cited in support of their holdings the applicable state law regarding assignments.

■ Although one of the significant changes made by the Bankruptcy Reform Act of 1978 was reduced reliance on nonbankruptcy law in determining what is estate property, some dependence on nonbankruptcy law is unavoidable.[16] Bankruptcy courts must still look to state law when determining the existence and nature of a debtor's interest in property; that is, whether a debtor has any legal or equitable interest in an item. But once that determination is made, whether the property will come into the estate is a federal question.

Unfortunately, the extent of the debtor's interest in the account proceeds cannot be immediately ascertained by reference to the state of the law in Kentucky. Two Kentucky decisions remotely touching the issue are not dispositive. In both *R. C. Poage Milling Co. v. Economy Fuel Co.*[17] and *Spurlin v. Sloan*,[18] the Kentucky high court held that, because an assignment for payment of a debt was absolute and final it was effective as against a third party's subsequent attachment against the assigned funds. The *Spurlin* court also held, in a contorted treatment of Article Nine of the Uniform Commercial Code, that the assignment was not a security transaction, and thus did not necessitate filing for perfection under the UCC.

Neither of the Kentucky decisions, however, explored what interest, if any, remained in the assignor. It is one thing to conclude that an attaching creditor—or, as in at least one case,[19] a trustee in bankruptcy in the position of an attaching creditor—*has no claim* to assigned funds; it is another to conclude that an assignment *completely divests* the assignor of all legal and equitable interests in the assigned property.

That is a problem we also find with *Dannerbeck*, which vetoed the trustee's claim of title to the assigned funds, and *Bergstedt*, which did the same under the auspices of the new Bankruptcy Code. In those cases, and in other bankruptcy cases on which Logan-Kanawha relies,[20] the trustee sought recovery of the assigned property for the purpose of augmenting estate assets from which distribution to general creditors could be made. The question was simply who was entitled to the money—the trustee or the assignee.

That is not the same question which seeks resolution in this case. Here the question is whether, under Section 541 of the Code, the estate has *any* interest in the assigned funds that would enable this court to exer-

---

**15.** 502 F.2d 686 (9th Cir. 1974), cert. den. 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645.

**16.** 4 *Collier on Bankruptcy*, ¶ 541.02 (15th ed. 1979).

**17.** 128 S.W. 311 (Ky.1910).

**18.** 368 S.W.2d 314 (Ky.1963).

**19.** *Re Allied Products Co.*, 134 F.2d 725 (6th Cir. 1943), cert. den. 320 U.S. 740, 64 S.Ct. 40, 88 L.Ed. 438.

**20.** *Matter of Taylor's Mobile Home Sales, Inc.*, 602 F.2d 205 (9th Cir. 1979) (funds assigned to bankrupt employer's profit sharing plan were held in trust and thus not estate property); *Selby v. Ford Motor Co.*, 590 F.2d 642 (6th Cir. 1979) (funds impressed with statutory trust not estate property); *Danning v. Mintz*, 367 F.2d 304 (9th Cir. 1966) (assignment of income tax refund removed it from estate property); *Saper v. Wood*, 249 F.2d 401 (9th Cir. 1957) (funds paid under assignment were not preferentially received); *In re Turner*, 51 F.Supp. 740 (W.D. Ky.1943) (assignments and payments due under it did not constitute a preference).

cise jurisdiction over the dispute to entitlement to the assigned property.

Logan-Kanawha stresses that the terms of the assignments in question are absolute and irrevocable. That notwithstanding, there is little doubt in the court's mind that the assignments were given as security for the advances from the First National Bank. It is not only clear from the language contained in the assignments (to the effect that the assignments are collateral security for the loans), but it is also apparent from the ongoing relationship between lender and borrower in which assignments are made contemporaneously with advances.

We are not swayed by the purported absoluteness of the assignment language contained in the standard assignment form. As Professor Gilmore has written, it is a long-standing rule that "courts will determine the true nature of a security transaction, and will not be prevented from exercising their function of judicial review by the form of words the parties may have chosen."[21]

That principle has been relied on in other cases that have held that an assignment, absolute on its face, is in fact no more than an assignment for security. In *In re Joseph Kanner Hat Company*,[22] the bankrupt had obtained a loan from a bank and executed an assignment to the bank of $25,000 due it from a redevelopment agency. The assignment read "That Joseph Kanner Hat Company, Inc. ... in consideration of the sum of $25,000 ... does hereby sell, assign, and transfer ... any and all sums of money due and owing ... the said assignor by ... the Norwalk Redevelopment Agency."[23] The

bank contended that the assignment constituted a transfer of an absolute right to collect the assigned funds. The Kanner Hat Company's trustee asserted that the transaction was no more than a secured transaction under the Uniform Commercial Code, and that because the security interest had not been perfected by filing, the trustee's interest had priority over the bank's.[24]

The trustee prevailed. The court looked beyond the form of the words used by the parties and considered as controlling the substance of the transaction, which revealed the transaction to be an assignment for security. The assignment was delivered simultaneously with the loan, payments pursuant to it would be credited against the loan, payments exceeding the loan balance would be given to the assignor, and the bank's claim had been reduced by amounts collected from sources other than the assignment.

The holding in *Joseph Kanner Hat Co.* was relied on in *Major's Furniture Mart, Inc. v. Castle Credit Corporation, Inc.*,[25] a nonbankruptcy case in which a dispute arose between assignee and assignor over the possession of monies that constituted a surplus over the assigned accounts receivable. The court held the assignment created no more than a security interest, and required that the surplus be turned over to the assignor as mandated by § 9–502 of the UCC. Like the Second Circuit in *Kanner Hat*, the court looked through the express language in the assignments and based its holding on the true nature of the transaction.

---

21. 1 *Security Interests in Personal Property* § 2.6 at 47 (1965).

22. 482 F.2d 937 (2nd Cir. 1973).

23. Id. at 938 n. 4.

24. The court determined that under § 9–106 of the UCC the claim against the Redevelopment Agency was a "general intangible." § 9–102(1) makes Article 9 applicable "to any transaction intended to create a security interest in ... general intangibles, chattel paper or accounts" as well as "to any *sale* of accounts, contract rights or chattel paper." An outright

sale of the claim would therefore not have been governed by Article 9, making necessary the resolution of the sale/security interest dispute. Id., at 939 n. 5.

Because the claim in the case at bar is to account proceeds, and because the *sale* of accounts is subject to the UCC filing requirements, if the issue in this case were merely one of priority between the trustee and a creditor, it would be unnecessary to distinguish between the assignment as a sale and the assignment as a security device.

25. 602 F.2d 538 (3rd Cir. 1979).

That is what we do here. As revealed in the testimony of both a First National loan officer and Hurricane Elkhorn's president,[26] the transaction in which the assignments were made was designed to ensure the steady flow of loaned money for the orderly operation of Hurricane Elkhorn. First National loaned money on the strength of the accounts receivable created with each coal shipment, and received payment for those loans shortly after the coal reached its destination. First National deposited into a Hurricane Elkhorn checking account both the money it loaned and the money it received in payment of those loans. First National would debit that account in the amount of its earlier loan, leaving the remaining account balance for Hurricane Elkhorn's discretionary use.

One may also infer that there was more money paid to First National than needed to discharge the debt owed to it. First National loaned Hurricane Elkhorn only 80% of the value of its receivables, yet later would receive full payment on them. The excess would be made available to Hurricane Elkhorn for its general use.

Hurricane Elkhorn's and First National's course of dealing thus convinces us that the assignments of receivables did not divest Hurricane Elkhorn of all interest in those receivables. Except for its possessory interest, Hurricane Elkhorn retained the interest any debtor retains in property it gives as security for a debt. That interest, we hold, is sufficient to compel Logan-Kanawha to turn over the money it owes on Hurricane Elkhorn's accounts receivable.

We look for support to the provision upon which all determinations must be made of whether property is part of the estate—Section 541. That Section 541 provides an expansive definition of estate property is subject to little debate. It includes in an estate "all legal and equitable interests of the debtor in property as of the commencement of the case." Its breadth is further attested to in its legislative history [27] and is considered one of the most significant changes in the bankruptcy law.

It has been disputed, however, just what interests of the debtor come into the estate, and whether the property to which those interests are wedded fully becomes estate property. Almost without exception, the controversy develops when a trustee or debtor-in-possession seeks turnover of property under § 542.

Thus far, most cases considering the question of whether a debtor's property interest is sufficient to pull the property into the estate, for purposes of turnover, have arisen as a result of a pre-petition tax levy. The taxing authority, usually the IRS, has contended that the levy absolutely divests the debtor of all interest in the property, and thus does likewise to the debtor's estate. Courts that have favorably received that argument,[28] about half of those deciding the issue, have focused on the principle that an interest in property which is limited in the hands of the debtor is equally limited in the hands of the debtor's estate.[29] Those courts, as a rule, have reasoned that only the *interest* a debtor has in property, and not the property itself, comes into the estate. They have deemed a debtor's interest in levied property insufficient to permit in-

---

**26.** Proof in this case has been adduced by deposition of employees and officers of the parties. Although we are mindful that the Sixth Circuit has questioned the wisdom of relying solely on a written record in complex bankruptcy proceedings, *In re Clemens*, 472 F.2d 939, 949 N. 1 (6th Cir. 1972), we are confident that the depositions have sufficiently elucidated the facts of this case leaving for us only the resulting question of law.

**27.** H.R.Rep.No.95–595, 95th Cong., 1st Sess. 367–8 (1977); S.Rep.No.95–989, 95th Cong.,

2nd Sess. 82–3 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

**28.** *In re Cross Electric*, 664 F.2d 1218 (4th Cir. 1981), rev'g 512 F.Supp. 511, 11 B.R. 998 (W.D. Va.1980); *In re Parker GMC Truck Sales, Inc.*, 12 B.R. 667 (Bkrtcy.S.D.Ind.1980); *Bush Gardens, Inc. v. United States*, 10 B.R. 506 (Bkrtcy. D.N.J.1979); *In re Paukner*, 10 B.R. 29 (Bkrtcy. N.D.Oh.1981); *Winfrey Structural Concrete Co. v. I.R.S.*, 5 B.R. 389 (Bkrtcy.D.Colo.1980).

**29.** 124 Cong.Rec. H 11,096 (daily ed. Sept. 28, 1978).

clusion of that property in the estate,[30] and thus have not subjected that property to § 542 consideration. Of apparent significance to those courts was the debtor's inability to claim a possessory interest in the property.[31]

It would appear under that reasoning, then, that if a debtor lost possession of property shortly before bankruptcy, the estate would have little interest remaining in the property with which to compel its turnover. The courts that have ruled against the taxing authority in the tax levy cases have recoiled at the possibility.[32] The court in *Matter of Aurora Cord and Cable Co., Inc.* observes, for instance, that if that reasoning were accepted, "arguably any property which the debtor did not have possession of, and in which another appeared to have a substantial interest, might not be considered property of the estate." [33]

Instead of plucking out interests from levied property and then determining whether the interests of the estate are sufficient to bring the property into the estate, courts holding with *Aurora Cord and Cable* have treated the levied property as estate property *subject to* the adverse interest of the party in possession of it.

To so hold does no indignity to the rule limiting an estate's interest to the interest of the debtor. It merely draws into the estate from the outset property in which the debtor has an interest, subject to any adverse interest. In the process, the estate still acquires no greater interest in the property than the debtor had.

Said a slightly different way, the *Aurora Cord and Cable* approach creates a presumption of includability in the estate, leaving it to the property claimant, even the possessory claimant, to rebut the presumption and retrieve the property interest from the estate. That is a view compatible with the broadened definition of "property" and the expanded jurisdiction of this court under the Bankruptcy Code, and we adopt that view.

Our approach meshes with the long-standing rule that property subject to liens or encumbrances is not precluded from becoming property of the estate, but becomes an estate asset subject to any existing liens.[34]

To consider as estate property that which another has possession of, but in which a debtor retains some interest, is *not* tantamount to requiring a turnover. It merely puts the turnover question before the court. Those courts restricting the inclusion of certain property in the estate foreclose consideration of whether the property is subject to turnover. That constrictive approach would mean, wrote the Bankruptcy Court for Connecticut, that:

> No discretion would remain in the bankruptcy court to consider whether the ... debt can be adequately protected, and whether to allow the business to operate not only for the benefit of the debtor and its creditors, but also for the benefit of the community at large.[35]

That court also noted that §§ 542(a) and 363 provide safeguards to a party holding estate property. When estate property is in

---

**30.** In tax levy cases, courts have identified only three interests retained by a debtor in levied on property 1) the right redeem, 2) the right to have sale proceeds applied to the tax liability, and 3) the right to surplus from the sale.

**31.** See e.g. *In re Cross Electric*, supra n. 28 at 1221.

**32.** *In re Ray Heid, Inc. v. I.R.S.*, 13 B.R. 171 (Bkrtcy.D.N.M.1981); *Bristol Convalescent Home, Inc. v. IRS*, 12 B.R. 448 (Bkrtcy.D.Conn. 1981); *In re Hudson Valley Ambulance Service, Inc.*, 11 B.R. 860 (Bkrtcy.S.D.N.Y.1981); *In re Whiting Pools, Inc.*, 10 B.R. 755 (Bkrtcy.W.D.N. Y.1981); *Matter of Troy Industrial Catering*

*Services*, 2 B.R. 521 (Bkrtcy.E.D.Mich.1980); *Matter of Aurora Cord and Cable Co., Inc.*, 2 B.R. 342 (Bkrtcy.N.D.Ill.1980).

**33.** Supra note 32, at 345.

**34.** *In re National Grain Corp.*, 9 F.2d 802 (2nd Cir. 1926); *New York Casualty Co. v. LaGrange*, 33 F.Supp. 993 (W.D.Ky.1940); *In re Dublin Veneer Co.*, 1 F.Supp. 313 (S.D.Ga. 1932), mod. 68 F.2d 364 (5th Cir.), cert. den. 292 U.S. 645, 54 S.Ct. 779, 78 L.Ed. 1496.

**35.** *Matter of Bristol Convalescent Home*, supra n. 32, at 451.

the hands of another, turnover of the property under § 542(a) will follow only if it is "property that the trustee may use, sell, or lease under § 363." Under § 363(e) an entity that has an interest in such property may request that the court "prohibit or condition [its] use, sale or lease as is necessary to provide adequate protection of such interest."

A creditor with a substantial interest in estate property is therefore not without substantial protection of that interest. It may seek as either a bar or condition precedent to turnover that its interest be adequately protected. Section 361 provides methods of adequate protection that essentially require that a secured party receive the "indubitable equivalent" of his security. If there is a deficiency in the adequate protection, § 507(b) provides a "super priority" to allow payment of the deficiency before payment of any administrative expenses.

These protections comprise an effective counterbalance to the manifestly broad scope of § 541. The court's discretionary employ of §§ 542(a) and 363 also helps ensure the viability of a debtor-in-possession's reorganization effort. That reorganization effort would be virtually ignored if property in which a debtor had a substantial, albeit nonpossessory, interest were excluded from the estate. In analyzing the interests of a debtor-in-possession in levied-on property, one court was compelled to write, "the right to possession must necessarily be supplied from the intent of the Bankruptcy Code: to provide a fresh start for the debtor and to protect the interest of all creditors. Once the debtor's right to possession is recognized, this Court can order a turnover." [36]

This case involves facts slightly different from the facts in the tax levy cases. Rather than the secured party arguing against inclusion of property in the estate, a third party makes the argument. Unique as the facts and issues in this case are, though, they are not without precedent. A tripartite relationship much like the one involved here formed the basis for an action in *In re Shoppers Paradise, Inc.*[37]

Shoppers Paradise, the debtor-in-possession, was the ground lessee of approximately nine acres of land on which it constructed a large building. Shoppers later leased the land it held under the ground lease and the building to Masters, Inc. At the same time Masters loaned Shoppers $200,000.00. After it executed the lease with Masters, Shoppers entered into a leasehold mortgage with a third party in the face amount of $1,300,000.00. As collateral security for the mortgage payment, Shoppers executed an assignment of rents to the mortgagee, notice of which the mortgagee sent to Masters.

When Shoppers filed for Chapter 11 relief, the mortgagee had perfected the assignment of rents pursuant to state law, and Shoppers was still leasing to Masters but had not yet repaid Masters for the $200,000.00 loan. Masters sought to offset what it owed in post-petition rents against the pre-petition debt of $200,000.00.

The court, relying on § 553, held invalid Masters' attempted setoff. Further, although it is not clear whether the parties addressed the issue, the court held that the assigned rentals were estate property and required their delivery to Shoppers. It also noted that the rents constituted cash collateral within the meaning of § 363, and that accordingly Shoppers' mortgagee could invoke § 363(e) to condition Shoppers' use of cash collateral on its being provided adequate protection. In the meantime, the mortgage was prohibited under § 362 to collect post-petition rentals.[38]

---

**36.** *In re Ray Heid, Inc. v. I.R.S.*, supra note 32, at 174.

**37.** 8 B.R. 271 (Bkrtcy.S.D.N.Y.1980).

**38.** There is only one factual distinction between this case and *Shoppers Paradise*. In this case, Hurricane Elkhorn and its secured assignee,

First National Bank, have agreed to the conditions under which Hurricane Elkhorn may continue to use the cash collateral produced by the assigned accounts receivable. In a motion styled "Motion to Use Cash Collateral Pursuant to Section 363, and to Continue Accounts Re-

The court ordered Masters to pay rent to Shoppers under § 542(b), which provides:

> Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

■ Because we have concluded that the debt is property of the estate, we too rely on § 542(b) in ordering that Logan-Kanawha pay Hurricane Elkhorn the debt of $84,652.60. The only exception to § 542(b), setoff under § 553, we hold not applicable in this case.

Section 553(a) recites the condition under which a setoff in bankruptcy may lawfully be made:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a *mutual debt* owing by such creditor to the debtor *that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case* . . . (emphasis added).

The converse to the rule set out in § 553 is this: "debts owed to and claims against the debtor prior to bankruptcy cannot be set off against debts owed to or claims against the debtor's estate (as represented by the trustee) arising after bankruptcy. This is because the element of mutuality is lacking." [39]

The indebtedness that Logan-Kanawha set off did not arise until after Hurricane Elkhorn filed its petition. On the statement accompanying Logan-Kanawha's check that reflected the setoff, coal shipment dates of February 24, 25, and 28, 1981 and March 3, 1981, were given in explanation for the payment. [40]

These shipments were made after the filing date of February 2, 1981. Because the Cincinnati Gas and Electric Company likewise did not receive the shipment, and thus did not pay Logan-Kanawha for it until after February 2nd, Logan-Kanawha in turn did not become indebted to Hurricane Elkhorn until after the filing date.

■ Logan-Kanawha not only made a setoff to which it was not entitled, it also did so without regard to the automatic stay of § 362. Section 362(a)(3) prohibits "any act to obtain possession of property of the estate or of property from the estate," and § 362(a)(6) prohibits "any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case under this title." Even those setoffs that would be valid under § 553 cannot be made absent relief from the automatic stay. [41]

■ We will not, however, issue a contempt citation to Logan-Kanawha for the invalid setoff. As the length of this opinion will attest, answers to the questions raised in this case are not clear-cut; they were arrived at only after careful deliberation.

■ We cannot, therefore, impute to Logan-Kanawha the motives and intentions

ceivable Financing," First National and Hurricane Elkhorn agreed that the bank would have an ongoing security interest in account proceeds. Hurricane Elkhorn and First National thus provided their own measure of adequate protection, obviating the need for both § 362 and § 542(a) considerations.

**39.** 4 *Collier on Bankruptcy*, ¶ 553.10[1] (15th Ed. 1979).

**40.** The dates of shipment reflect the dates on which the coal was shipped by barge. Some coal was shipped from the mine by rail to the barge loading sight pre-petition. On page 95 of

his deposition Hurricane Elkhorn's president Charles Schwab testified that 358.35 tons, with "75% advance" value of $1,059.13 was shipped by rail pre-petition. Mary Sparks of Logan-Kanawha testified that 593 tons were shipped pre-petition by rail. Whatever the figure, Logan-Kanawha's debt to Hurricane Elkhorn did not accrue until after the utility company paid for the coal shipment. That payment was made post-petition.

**41.** Section 362(a)(7) stays "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor."

of a creditor seeking to circumvent the automatic stay in deliberate disregard of the Bankruptcy Code. We reserve the awesome power of contempt for only those creditors whose actions show a clearly contumacious frame of mind.

For the same reason, we deny Hurricane Elkhorn's request for attorney fees and costs. This controversy has been characterized by rancorous exchanges that have done little to illuminate the issues, including unfounded charges made by Hurricane Elkhorn that Logan-Kanawha intentionally misrepresented facts to the court to cover up "plotting" that occurred before the unlawful setoff.[42] We observe nothing in Logan-Kanawha's behavior, however, to indicate that it acted dishonestly or dishonorably in claiming entitlement to the money it withheld.

That First National will likely benefit from the turnover does not affect the outcome of this case. A petition-date agreement for use of cash collateral provided for Hurricane Elkhorn's continued use of accounts receivable proceeds.[43] It also provided First National with relief from the automatic stay to collect the post-petition receivables and with a security interest in those receivables and their proceeds. Logan-Kanawha's status as account debtor was not affected, and thus neither was its liability for the debt.

Upon the foregoing reasoning and authorities, Logan-Kanawha is therefore ORDERED to pay First National Bank of Louisville, assignee of Hurricane Elkhorn Coal Corporation II, the sum of $84,652.60. This is a final and appealable order.

---

42. Brief of Hurricane Elkhorn at 17.

43. See supra note 38. This order is compatible with that agreement. We are fully aware that this order essentially resolves a dispute between two parties, neither of which is the petitioner. The dispute, however, is sufficiently related to the petitioner's reorganization to permit our exercise of jurisdiction over it. See e.g. 28 U.S.C. § 1471. Without the petitioner's continued use of receivables as cash collateral, its interim operations would not be viable.