**In re O.P.M. LEASING SERVICES, INC., Debtor.**

**James P. HASSETT, as Trustee of O.P. M. Leasing Services, Inc., Plaintiff,**

**v.**

**SPRAGUE ELECTRIC CO., Defendant.**

**Reorganization No. 81 B 10533 (BRL). Adv. 82–5679A (BRL).**

United States Bankruptcy Court, S.D. New York.

June 6, 1983.

Zalkin, Rodin & Goodman, as Trustee of O.P.M. Leasing Services, Inc., New York City, for James P. Hassett.

Milgrim, Thomajan, Jacobs & Lee, Sprague Electric Co., New York City, for defendant Sprague Elec. Co.

## DECISION ON TRUSTEE'S MOTION AND SPRAGUE'S CROSSMOTION FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Bankruptcy Judge.

The instant litigation pits the reorganization Bankruptcy Trustee ("the Trustee") of O.P.M. Leasing Services, Inc. ("OPM") against one of OPM's customers. OPM, an acronym for Other People's Money, was the vehicle for one of the largest frauds in history. For further background information detailing the complexity, ingenuity, economic imperatives and often bizarre nature of the various OPM transactions including the ones in question here, see the Trustee's Report filed with this Court on April 25, 1983 pursuant to Section 1106(a)(4) of the Bankruptcy Code (the "Code").

Essentially the same two parties are involved in two role reversal lease transactions. The issue of offset, ordinarily simple and governed by the cleavage date of the filing of a Chapter 11, is unduly complicated in this case by the pre-petition interaction of the parties under mutual contractual obligations. The debtor is a lessor under one lease calling for payment of a monthly rental net to it of approximately $11,000 and is a lessee under a second lease with an $11,000 monthly rental obligation to its transactional partner. The debtor's rental payment obligations have not been fulfilled, and not surprisingly, the transactional partner has reacted post petition by not paying its lease obligation. Thus the spectre of pre-petition debt offset against post-petition obligation becomes our focus.

### I. *Background Facts*

In 1978, O.P.M. Leasing Services, Inc., a major national and international computer leasing firm, and Sprague Electric Company, a manufacturer of electrical equipment, entered into a series of computer leasing agreements. During the active term of these agreements, O.P.M. petitioned for relief from its creditors ("the Petition") and permission to reorganize under the provisions of Chapter 11 of the Code on March 11, 1981 ("the filing date"). The business relationship between Sprague and OPM has changed as a result of the Petition and the Trustee seeks from this Court an assessment of the current rights and duties of each party under certain of the abovementioned rental agreements.

The Trustee alleges that his rights in interest as Trustee to monies payable by Sprague on a lease entitled "Equipment Schedule 4" ("E.S. 4") have been ignored by Sprague since the OPM petition was filed. According to the Trustee, Sprague has defaulted on its E.S. 4 obligation as of March 1, 1981 (the date when payments stopped), and is now liable under section 12.1 of the Master Lease[1] for the accelerated sum of payments withheld since March 1, 1981. The Trustee also claims all interest accruing from the date of default as well as damages and expenses incurred, including reasonable attorney's fees. The Trustee filed a summary judgment motion with the Court alleging that there are no material triable issues of fact. By its cross-motion for summary judgment, Sprague sought, *inter alia,* dismissal of the Trustee's complaint and entry of judgment in its favor.

The basis for the Trustee's claim is that the withholding of payments due and owing on the E.S. 4 since the filing date results in a "post petition" debt to OPM. Citing Section 553(a) of the Code as the applicable section, the Trustee further claims that this post-petition debt is being impermissibly set off against claims by Sprague dating from the pre-petition period. In opposition, Sprague contends that Section 553 of the Bankruptcy Code does not apply because OPM had assigned its interest in the payments made on E.S. 4 to a commercial lender not in bankruptcy two years before the filing date, and therefore OPM no longer possesses any valid interest in these payments.

The parties evidence a general agreement as to the substance of transactions involved herein[2]. In 1978, Sprague was leasing a basic computer system from another leasing company. Sprague approached OPM in order to lease accessory equipment which would upgrade that system. Sprague and OPM agreed to an arrangement whereby OPM leased to Sprague the accessory equipment it needed to upgrade and, in turn, it promised to sublease Sprague's basic system. The net effect was that Sprague gained the use of totally new equipment while paying only for the use of the accessory equipment. OPM presumably planned to reduce its liability as sublessee by placing the old Sprague equipment on the secondary leasing market, which consisted of those corporations with less complicated computer needs. Because the equipment became obsolete, such marketing became impractical.

The correlative monthly financial obligations of Sprague and OPM under the terms of E.S. 4 and the Sublease, payable over 52 consecutive months, were as follows:

Owed by:

Sprague to OPM –
Replacement Equipment . . . . . $11,770
Accessory Equipment . . . . . . . 1,927
$13,697

OPM to Sprague –
Subleased Equipment . . . . . . . $11,770

Sprague was obligated to make all rental payments on E.S. 4 to OPM or OPM's assignee without offset pursuant to Section 11 of the Master Lease which was incorporated into the E.S. 4 lease.

A. *The Loan Transaction*

OPM's business involved frequent and complex loan arrangements from which it would obtain computer purchase money. Its corporate growth and perceived success in the computer leasing field was tied to this financing, and it often utilized rental payments due and owing under existing

---

1. E.S. 4 was subject to the terms and conditions of the Master Agreement of Lease between OPM and Sprague dated October 27, 1978.

2. Sprague's Memorandum in Opposition to trustee's Motion for Summary Judgment and in Support of its Cross-Motion for Summary Judgment admits that O.P.M.'s statement of the facts in its brief and Rule 3(g) statement generally describe the background of the parties' dealings and the factual setting in which these motions must be determined. However, Sprague also refers to a fundamental disagreement between the parties as to the nature and extent of an assignment of rental monies of crucial importance to the disposition of the case. Although Sprague characterizes this as a factual conflict, this issue may be decided as a matter of law. Therefore, it is reserved for consideration *infra*. *See also* note 3 *infra*.

leases as collateral for the loans. In July, 1979, OPM gave a promissory note (the "Note") for about $362,000 to Citicorp Industrial Credit Inc. ("Citicorp"), assigning E.S. 4 as partial collateral under a Security Agreement dated July 17, 1979. According to Section 1.08 of the Security Agreement, Citicorp became the assignee of OPM's right to receive rental payments from Sprague, commencing with the payment due August 1, 1979 "as security for the payment of all amounts payable under or in respect of the Note."

Sprague gave OPM its Consent and Agreement to the Assignment (the "Consent") reserving to itself certain protections for the remainder of the lease term. Chief among these protections was a guarantee of "the right to offset against each monthly [E.S. 4] rental payment . . . an amount equal to . . . rental payments payable to [Sprague] under the sublease agreement dated November 30, 1978".

In August 1979, pursuant to the Security Agreement and its own Consent, Sprague began to pay the entire amount due under E.S. 4 to Citicorp. Citicorp would then remit to OPM each month the portion of the payment that was in excess of the amount necessary to service OPM's loan obligation. This generally resulted in a credit of $11,770 to OPM.[3]

As described earlier, OPM filed its Chapter 11 Petition on March 11, 1981. On December 8th of that year, the Trustee rejected the Sprague sublease pursuant to the provisions of Code Section 365(a). OPM's monthly sublease obligation of $11,770 has not been paid since the filing date.

Sprague maintains that the rejection by the Trustee constitutes a default under Section 18 of the Sublease Agreement, and that Sprague is empowered by the mutually signed Consent "to use [the] right of offset to recover any and all amounts due" it under that agreement. As a result, Sprague has routinely deducted $11,770 from its monthly payments to Citicorp since the filing date.

Although each party finds some fault with the other's statement of the facts, see note 2, their significant disagreements actually concern matters of applicable law. These legal issues I shall address in turn. This court is satisfied, however, that there are no remaining material triable issues as to the facts of the case. Accordingly, I conclude that the action is ripe for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as applied in bankruptcy matters by Bankruptcy Rule 756. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 161, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142 (1969).

## II. *Issues Presented*

The Trustee claims that the E.S. 4 payments withheld by Sprague since the filing of OPM's Petition are the rightful property of the estate, and that the estate has been subject to an improper offset pursuant to Code Section 553 against unsecured pre-petition debts of OPM. Sprague contends that because OPM had assigned all of its interest in the E.S. 4 equipment to the lender by the time it filed its Petition, the requirement of mutuality of offset under Code Section 553 does not arise at all. Because after the assignment it owed its debt in E.S. 4 exclusively to the lender, Sprague argues that it may permissibly offset the debt owed it by OPM against the debt it owed the lender, an entity not in bankruptcy, regardless of the mutuality provisions of the Bankruptcy Code. These contentions pose three distinct questions of law:

1. Did OPM retain any interest in the E.S. 4 payments after their July 17, 1979 assignment to Citicorp?

2. Can such an interest, if present, be termed property of the estate as defined by the Bankruptcy Code?

---

**3.** There were two payments made by Sprague directly to OPM and not Citicorp. These came in April 1980 and July 1981. This Court does not believe that these anomalous payments, which were simply divided between the accounts of OPM and Citicorp, represent significant departures from Sprague's pattern of behavior in the case and as such does not accord them substantial importance.

3. If such an interest is property of the estate, would such property be subject, under Code Section 553, to setoff in the manner undertaken by Sprague?

### III. *Discussion of Law*

#### A. *OPM's Retention of Interest in the Rental Payments to Citicorp*

■ As to the first issue, the Trustee contends that OPM assigned its right to receive only a portion of the E.S. 4 rent to Citicorp. Sprague rejects this interpretation of the Security Agreement, maintaining instead that, on its face, it was an assignment of the entire amount of those payments, without reservation by OPM of any right or interest in them.

Sprague grounds its position in the main on the following language taken from the Consent and Agreement ("the Consent") dated July 17, 1979 that was signed by both OPM and Sprague:

> "[Sprague] hereby acknowledges and consents to the assignment by OPM to the Lender of *all of OPM's estate, right, title, interest, claim and demand in, to and under the Equipment Schedules,* and the rental payments due under the Equipment Schedules..." (Emphasis added.) *Id.,* ¶ 2

Sprague claims that this clause establishes as a matter of law that OPM's interest in E.S. 4 had come to an end by the time it filed the Petition and that Section 553 of the Code is thus inapposite.

In attempting to rebut this contention, the Trustee offers a detailed and highly persuasive examination of the Security Agreement and related papers. For the reasons detailed below, this Court concludes that the assignment in question comprehended only that portion of the rental payments required to secure the repayment of OPM's obligation to Citicorp.

The Security Agreement should be read in the context of the Note it secures. This is underscored in the Preliminary Statement of the agreement, which attests to OPM's present intent "to grant the collater-al as security for the payment of all sums payable" in the servicing of the Note.

Sprague's monthly payments to Citicorp were generally in excess of the amount owed monthly by OPM on the Note. Furthermore, the Note was collateralized by more than simply payments under E.S. 4. Payments from another equipment schedule, E.S. 1 contributed $10,800 a month to the $12,727 due monthly for the initial 29 months of the Note. Thus, E.S. 4 was only footing $1,927 of the bill in the initial period. Nevertheless, Sprague was required by the Consent and the Security Agreement to pay over to Citicorp the entire $13,697 due and owing each month under E.S. 4.

An application of the most basic arithmetic skills to this transaction reveals that Sprague paid out $1,927 per month in service of the Note from E.S. 4 rental payments during these initial 29 months. OPM charged Sprague exactly that amount for the accessory equipment. The remainder of $11,770 was an excess amount that OPM and Citicorp had anticipated would be remitted to OPM.

It should also be noted that during the next 14 months, the same situation existed. Only $1,927 of the $13,697 paid by Sprague to Citicorp served as debt service on the Note. This was to be followed by one monthly installment on the note of $4,315.67 and two monthly installments due April 1, 1983 and May 1, 1983 of $13,697. Therefore, during 43 of the 46 monthly installments on the Note, only $1,927, the cost of the accessory, out of the $13,697 paid directly by Sprague to Citicorp was debt service on the Note.

The parties anticipated this continued interest by OPM despite the assignment, and provided for it in the Security Agreement, which states:

> *Section 3.01. Rental Payments*
> "Rental payments under the Equipment Schedules received by the Secured Party shall be applied forthwith to the payment of all interest (including penalties) and Installment Payments then payable on the Note, *and any balance shall be remitted to or upon the order of OPM...*"

It is likely that OPM planned to apply the monthly balance due from Sprague on the E.S. 4 equipment to the Sublease, both amounts being $11,770. Nevertheless, the Security Agreement establishes that Citicorp was to credit OPM for the monthly balance, and this seriously undercuts Sprague's contention that the arrangement constituted an absolute assignment to Citicorp and that OPM's interest in E.S. 4 had come to an end before the time it filed its Petition.

Furthermore, OPM's continuing rights, duties and interests in E.S. 4 following the assignment are not limited to the sections of the Security Agreement on rental payments to OPM. Chief among these continuing rights is Section 8 of the Master Lease which retains in OPM a reversionary right in the equipment itself. Section 8 states:

"Upon termination (by cancellation, expiration by its terms or otherwise) of each Equipment Schedule, Lesee shall, pursuant to Lessor's instructions and at Lessee's expense, return the Equipment to Lessor..."

Accordingly, in light of the Master Agreement, it is abundantly clear that OPM did not give up these reversionary rights in its property, and that, at the end of E.S. 4, Citicorp would not fall heir to the equipment. Sprague thus maintained its obligation to return the equipment to OPM upon termination of the agreement "in the same operating order, repair, condition and appearance as when received, less normal depreciation and wear and tear."

In addition, OPM also covenanted in Section 1.01 of the Security Agreement to "forever warrant and defend its interest in and to the equipment" and in Section 1.06, to "pay or cause to be paid all taxes (including income franchise and gross receipts) ..." levied or assessed upon the collateral. Furthermore, pursuant to Section 4.02(e) in the event of continuing default, Citicorp had the right *inter alia* to "exclude OPM from the Equipment and take possession of OPM's interest therein."

Admittedly, the foregoing analysis directs the Court to a conclusion not at all in keeping with the general language of both the Consent and the Security Agreements, to wit that "OPM hereby grants to the Secured Party all of OPM's estate, right, title, interest, claim and demand in, to and under (a) the Equipment [and] (b) the Equipment Schedules..." This conclusion is, however, in keeping with both prior bankruptcy writings and decisions, and the dictates of common sense.

For example, in a strikingly similar case, *In re Hurricane Elkhorn Coal Corp. II,* 19 B.R. 609 (Bkrtcy.W.D.Ky.1982), the debtor made an assignment of accounts receivable in order to secure a bank loan of lesser value than the accounts receivable. Logan Kanawha, the debtor's agent, and the conduit through which payments were made for coal to the debtor's assignee, overpaid the debtor's assignee pre-petition and subsequently withheld payment in the amount of the overpayment post-petition. The debtor and his assignee claimed an illegal setoff by Logan Kanawha as well as a violation of the automatic stay provided by § 362 of the Code. Logan Kanawha, like Sprague, claimed that the debtor's estate had no interest in the accounts receivable because it had assigned away all of its interest in a Security Agreement stating that Hurricane "sells, conveys and assigns," and again "transfers, sets over, and assigns" its accounts receivable to the bank. *Id.* at 614. The Court found, however, that the course of dealing between Hurricane Elkhorn and the bank was convincing evidence that Hurricane Elkhorn retained "the interest that any debtor retains in property it gives as security for a debt. That interest ... is sufficient to compel Logan Kanawha to turn over the money it owes on Hurricane Elkhorn's accounts receivable." *Id.* at 617. *See also In re Shopper's Paradise,* 8 B.R. 271 (Bkrtcy.S.D.N.Y.1980), where Judge Schwartzberg held invalid a purported offset by a lessee of the post-petition rents it owed the debtor but was paying the debtor's assignee against the pre-petition debt owed it by the debtor.

Another purportedly absolute assignment to a lender was held to nevertheless create

a residual property interest in the estate of the assignor and not "an absolute right to collect the sum due" as asserted by the lender against a third party. In *In re Joseph Kanner Hat Co., Inc.*, 482 F.2d 937 (2d Cir.1973), the debtor assigned a legal claim which it had planned to institute against a third party as collateral for a loan. The terms of the agreement between Kanner Hat and the bank specified that Kanner "absolutely assigned, transferred and sold any and all right, title and interest it had" in the legal claim. *Id.* at 938. Once again, this language of absolute assignment did not prevent the Second Circuit from examining the underlying nature of the transaction and holding that the assignment created nothing more than a security interest for the bank. The court so held based upon the fact that, *inter alia:*

> [T]he assignee for security may collect the assigned claim and apply the proceeds in satisfaction of the debt secured; the balance, if any, belongs to the assignor. *Id.* at 940.

Thus, because any payment received under the assignment would be applied to reduce the amount of the loan and because any payments over and above the loan amount would be remitted to the assignor, the court determined that this was merely an assignment for security, not an absolute assignment.

Citing Professor Gilmore for what has become a well-settled rule of interpretation in cases involving credit agreements, the court continued:

> "[C]ourts will determine the true nature of a security transaction, and will not be prevented from exercising their function of judicial review by the form of the words the parties may have chosen" *Id.* (citing Gilmore—1 Security Interests in Personal Property § 2.6 at 47 (1965)).

Thus, the Court established that it is often inadequate merely to apply in a mechanical fashion the bare language of an agreement and declared that since the assignment represented a security interest that was unperfected, the claim of the trustee of the as-

signor was entitled to priority over the bank's claim.

The approach of the Court in *Kanner Hat* was cited with approval and followed in *Major's Furniture Mart, Inc. v. Castle Credit Corporation, Inc.*, 602 F.2d 538 (3rd Cir. 1979). In that case, Castle Credit Corp. claimed that the plaintiff, Major's Furniture Mart, had sold its interest in various accounts receivable to Castle and that this effectively divested Major's of all its former interests in them. Although the agreement contained terms like "purchase", "sale", and "discount", the Third Circuit found that Major's credit obligation to Castle was nevertheless merely a transfer to secure indebtedness. In so ruling, the court reasoned that none of the risks of uncollectability generally present in a true sale of accounts was transferred to the credit company because of the credit company's recourse to Major's. Thus, the true nature of the transaction was that of a secured loan. In addition, the Third Circuit justified its holding, stating that neither the custom of the parties nor their relationship gave rise to more than a debtor-creditor relationship. *Id.* at 546. As a consequence, Major's was entitled to reimbursement from Castle for the value of the surplus on the collection of the accounts not previously remitted to Major's.

In the instant case, under the Security Agreement of July 17, 1979, only a fraction of the rents owed by Sprague to OPM pursuant to E.S. 4, as described earlier, was intended for use in the cancellation of OPM's debt to Citicorp. According to the bank's schedule of payments, 43 of the 46 payments due on the Note were equal to the cost of the accessory equipment, to wit $1,967. The excess portion, amounting to a balance of nearly $12,000 on each monthly payment that Citicorp received from Sprague, was to be remitted to OPM. In Section 3.01 of the Security Agreement, Citicorp agreed that this balance was to "be remitted to or upon the order of OPM . . ."

### B. *Payments to Citicorp as Property of the Estate*

To obtain a judgment in his favor, the Trustee must also establish that OPM's

identified interest in the payments made pursuant to E.S. 4 can be properly characterized as "property of the (debtor's) estate" as that term is defined in the Bankruptcy Code. According to the general provisions of Section 541(a), the commencement of a case under the Code creates an "estate", and ...

> "[S]uch estate is comprised of all the following property, wherever located: (1) ... *all legal or equitable interests of the debtor,* in property as of the commencement of the case. 11 U.S.C.A. § 541(a)(1) (1982) (emphasis added)

It is a well-established principle, originating in the equivalent section of the 1898 Bankruptcy Act[4], that property of the estate is not limited to items in the possession of the debtor or over which he exercises exclusive rights of title. *Collier on Bankruptcy* includes in its discussion of Section 541(a) some particularly valuable commentary on this point:

> Because the scope of Section 541(a)(1) is so broad and all encompassing, the discussion in the following paragraphs cannot be considered exhaustive. It is important to keep in mind, therefore, that the underlying theory of Section 541(a)(1) is to bring into the estate *all* interests of the debtor in property as of the date the case is commenced. *4 Collier on Bankruptcy* ¶ 541.06 (15th Ed.1979).

*See also In re National Grain Corp.,* 9 F.2d 802 (2d Cir.1926); *In re Hurricane Elkhorn Coal Corp.,* 19 B.R. at 617.

In *In re National Grain Corp.,* real property which was subject to various encumbrances, was held not precluded from becoming property of the estate because of those liens. Rather, the Court declared:

> "[I]f there is justification for the opinion that there will be an equity which will add to the assets of the estate, the court

may and should order such sale free of liens ...." 9 F.2d at 803

The court in *Hurricane Elkhorn,* the facts of which are described, *supra,* cited the "expansive definition" of property of the estate under Section 541, 19 B.R. at 617 in compelling the turnover directly to the bank-assignee of funds which had been held by the creditor as a setoff of its claim against the debtor based on the creditor's pre-petition overpayment to the bank of money it owed the debtor.

The court in *Hurricane Elkhorn* found support for its holding in cases finding that regardless of possession, a debtor may compel the turnover of property which was levied on pre-petition by a taxing authority. *See, e.g., In re Whiting Pools,* 674 F.2d 144 (2d Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 442, 74 L.Ed.2d 599 (1982); *In re Bristol Convalescent Home,* 12 B.R. 448 (Bkrtcy.D.Conn.1981); *In re Hudson Valley Ambulance Service, Inc.,* 11 B.R. 860 (Bkrtcy.S.D.N.Y.1981). The rationale in these cases for turnover to the debtor of property out of his possession is that the pre-petition levy does not completely divest the estate of all interest in the property.

In addition, in a non-levy case, *In re Greer Stump Plumbing, Inc.,* 9 B.R. 181, 185–86 (Bkrtcy.D.Ariz.1981) the court similarly held that the concept of property of the estate has been broadened greatly by the Code in finding that the debtor contractor's interest in a bonus fund resulting from reduction of workers' injuries was property of the estate.

This Court accordingly holds that E.S. 4 is property of the OPM estate. Sprague has attempted to withhold funds in which the OPM estate maintains an obvious and well-defined interest. *See* discussion *supra* of OPM's continued interest in the E.S. 4

---

**4.** The Supreme Court in *Segal v. Rochelle,* 382 U.S. 375, 379, 86 S.Ct. 511, 514, 15 L.Ed.2d 428 (1965), interpreted the provisions of the predecessor Act regarding property of the estate in the following manner:

> "The main thrust of § 70(a)(5) is to secure for creditors everything of value the bankrupt may possess ... when he files his peti-

tion. To this end, the term 'property' has been construed most generously ..."

The scope of Code Section 541 goes beyond even this generous construction, in that requirements that the debtor prove possession or constructive possession have been eliminated. *See In re Hudson Valley Ambulance Service, Inc.,* 11 B.R. 860, 862 (Bkrtcy.S.D.N.Y.1981).

payments. This withholding is to the detriment of the other creditors involved in the OPM reorganization and therefore cannot be countenanced. Given the continuing interest of OPM and the Trustee in this property, and the consistently liberal interpretation of Section 541(a) cited above, I find that the portion of the monthly E.S. 4 payments which did not contribute to the cancellation of OPM's debt to Citicorp is property of the OPM estate.

### C. The Right of Setoff

■ The final issue before this Court is whether Sprague, in setting off its claim for rents due under the Sublease agreement against the $11,770 monthly obligation it owes to the debtor under E.S. 4, acted in compliance with the laws governing reorganization. As of the filing date, there were 24 months remaining on the E.S. 4 contract. The parties do not dispute Sprague's continuing obligation on E.S. 4 in the post-petition period.

OPM has established that it maintained an interest in these rental payments despite the assignment of a portion of them to Citicorp. That this interest in E.S. 4 is "property of the estate" according to Code Section 541(a) has also been demonstrated. It thus appears that what Sprague has done is taken its monthly post-petition obligations to the estate of OPM and reduced them by an amount equal to its *own* wholly pre-petition claim against OPM for *sublease* rents. Sprague alleges that these setoffs were permissible according to the terms of the Consent. After the filing date, however, the Consent can no longer be considered dispositive of Sprague's rights in the matter. Sprague is bound by the Trustee's rejection of this sublease pursuant to Code Section 365(a) and an order of this court implementing such rejection dated December 8, 1981. The sublease is, accordingly, to be considered terminated immediately before the filing date. *See* 11 U.S.C.A. § 365(g)(1). Moreover, the legislative history of the rejection provision of the Code indicates that any legal indebtedness of OPM under the sublease can only have

arisen as a pre-petition obligation. *See* House Rep. No. 95–989, 95th Cong., 1st Sess. 349 (1977); Senate Rep. No. 95th Cong. 2d Sess. 60 (1978). As a consequence, Sprague's right to receive rents under the sublease accruing after March 11, 1981 are also deemed to have terminated immediately before the filing date.

Setoffs by creditors are governed by Section 553(a) of the Code. According to this section, the only allowable setoff is that of:

> "a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case..." 11 U.S.C. § 553(a) (1982)

Accordingly, the setoff that Sprague has allowed itself is wholly improper. A setoff cannot be employed under Section 553(a) because only one of these debts, the one owed by OPM to Sprague on the Sublease, arose prior to the commencement of the case. Because of the Trustee's rejection of the Sublease, this obligation is no longer in effect post-petition. The other debt, the one owed by Sprague to OPM on E.S. 4, remains in effect post-petition since no event of termination has occurred. Therefore, the setoff made by Sprague is impermissible as a matter of law because the element of mutuality of obligation is absent. *See In re Dartmouth House Nursing Home, Inc.,* 24 B.R. 256 (Bkrtcy.D.Mass. 1982); *In re Hurricane Elkhorn Coal Corp. II,* 19 B.R. at 620, *In re Shoppers Paradise, Inc.,* 8 B.R. 271 (Bkrtcy.S.D.N.Y.1980); *In re Princess Baking Corp.,* 5 B.R. 587 (Bkrtcy.S.D.Cal.1980). *See also* 4 Collier on Bankruptcy § 553.10[1] (15th ed. 1979).

The purpose of the mutuality requirement is to guarantee that amounts which a party is owed prior to the filing date are distinguished from those he is owed or must pay after his case goes forward. This conclusion is premised on the theory that once a petition is filed, an estate is created and the trustee is viewed differently from the debtor. *See In re Dartmouth,* 24 B.R. at

263; 4 *Collier Bankruptcy Guide* ¶ 66.05[1] at 66–10 (1982).

Thus, although Sprague remains indebted post-petition under the E.S. 4 lease for items it leased from OPM, the rental cannot be offset by the amount of the wholly pre-petition debt it is owed by OPM under the sublease.[5] Under other circumstances, once the sublease was rejected, the equipment might have been returned to Sprague and income could have been derived from it by further subleasing. That this avenue is not open to Sprague presently because the equipment is obsolete is unfortunate, but those who negotiated for Sprague knew or should have known and considered the risk of subsequent developments in technology and that the corporate fortunes of those involved could endanger the agreements.

IV. *Conclusion*

Based upon the foregoing, summary judgment is hereby granted to the Trustee on his complaint. Sprague's opposing motion for summary judgment must therefore be denied. Sprague is thus ordered to pay the Trustee all sums improperly withheld by the setoff of OPM's pre-petition debt to it against its post-petition obligations to OPM, along with all interest payable since the date of default.

Settle an order in conformity with this opinion.

---

**5.** In addition, this Court notes parenthetically that Sprague has failed to follow the requirements for offset under the Code. Pursuant to Sections 362(a)(7) and 553 of the Code, a creditor may not offset unilaterally after a reorganization petition is filed, since setoff is expressly subject to the automatic stay that takes effect as of the filing date. Rather, such a creditor must commence an adversary proceeding to obtain relief from the automatic stay prior to offset. *See* 4 Collier on Bankruptcy § 553.-05[2] (15th Ed.1979). *See also* A. Ahart, Bank Setoff Under The Bankruptcy Reform Act of 1978, 53 Am.Bankr.L.J. 205, 207 (1979).