Arthur ZANDITON, et al.,
Plaintiffs, Appellees,

v.

Michael B. FEINSTEIN, et al.,
Defendants, Appellees,

Theodore I. Libby, Harris B. Libby and
Ernest A. Singer, Defendants,
Appellants.

Arthur ZANDITON, Plaintiff, Appellant,

v.

Michael B. FEINSTEIN, et al.,
Defendants, Appellees.

Nos. 87–1390, 87–1473 and 87–1474.

United States Court of Appeals,
First Circuit.

Heard Dec. 11, 1987.
Decided June 16, 1988.

Steven A. Remsberg with whom Snyder, Tepper & Comen, Boston, Mass., was on brief for Arthur Zanditon.

William A. Horne with whom Goulston & Storrs, P.C., Boston, Mass., was on brief for Theodore I. Libby, Harris B. Libby and Ernest A. Singer.

Lois Bruckner Parks with whom Gary M. Ford, Gen. Counsel, John H. Falsey, Asst. Gen. Counsel, and Kevin L. Kehoe, were on brief for appellee Pension Ben. Guar. Corp.

Robert M. Bonin with whom Bonin & Zalcman, Boston, Mass., was on brief for appellee Robert M. Bonin.

Before COFFIN, TORRUELLA and SELYA, Circuit Judges.

COFFIN, Circuit Judge.

Republic Pipe & Supply Corporation (Republic Pipe), a closely held Massachusetts corporation, was owned by two family groups until 1973, when one of the groups sold all of their stock to the other family and resigned from the company. This case requires us to determine whether the family members who left remained responsible for the company's default on certain loans after their departure. The district court concluded that the family had promised continuing responsibility in two agreements signed in 1966. The departed family members appeal, and we affirm in part and reverse in part. We also affirm the district court's grant of summary judgment for an unrelated defendant.

## I. *Factual Background*

### A.

Republic Pipe and its wholly owned subsidiary, Republic Appliance Distributors Corporation (RAD), engaged in the wholesale distribution of plumbing, heating, electrical and refrigeration supplies. Republic Pipe, which was founded in 1917, was wholly owned until July 1973 by the Libby family group—Theodore I. Libby, his brother Harris B. Libby, their brother-in-law Ernest A. Singer, and a more distant relative, Arthur Zanditon—and the Feinstein family group—Michael, Gerald and Sheldon Feinstein. In 1952, Republic established a pension plan for its employees, the Republic Pipe & Supply Corporation Pension Trust (the Pension Trust or Pension Plan).

The three primary members of the Libby Group, who resigned from Republic Pipe and sold their stock to the Feinstein group in 1973, had been employed by the company in various capacities for periods ranging up to 34 years. Theodore Libby had at one time been chairman of the board of directors and treasurer, Harris Libby had been vice president of marketing, and Ernest Singer had been credit and personnel manager. Harris Libby and Ernest Singer also served as trustees of the Pension Trust from at least June 1, 1966, through the time of their resignations in 1973.

The controversy in this case revolves around loans made by the Pension Trust to Republic Pipe and RAD that were never repaid. The first loan was made to Republic Pipe in July 1966 for $60,000. At some time before August 1969, the Plan loaned $23,607.92 to RAD. In 1969, the Plan increased the loan to Republic to $90,000, and by 1970 the RAD loan had been reduced slightly to $23,542.64. Although Republic seemingly would "pay off" the loans every December by writing checks to the Plan in the amount of each note, in fact the loans simply were rolled over, with the Plan sending checks in January to Republic and RAD for the full amount of the loans.

When the loans first were made in 1966, the Libbys and Feinsteins tried to establish the transactions between the Pension Trust and Republic Pipe and RAD as arms-length undertakings despite the obvious conflict of interest inherent in the lending scheme because certain owners of the borrowing company were also trustees of the lending Pension Trust. The loans were secured by copper pipe inventory, and this security interest was recorded with the Secretary of State of Massachusetts. In addition, the seven Republic Pipe shareholders signed a series of interrelated security and indemni-

ty agreements on June 1, 1966—a month before the Pension Trust trustees approved the first loan to Republic Pipe—presumably to provide personal assurances that the loans would be repaid and to distribute any potential liability among the seven. None of these documents, reproduced in their entirety in an appendix to this opinion, specifically was renewed when the loans were rolled over each year.

Two of the agreements were signed only by Theodore Libby and Michael Feinstein. In one, the two men pledged a total of 841 shares of Republic stock owned by them as "collateral security for any loan or loans now or hereafter made by the Trustees [of the Pension Trust] to the Pledgors [Republic and RAD]." We shall refer to this agreement as the "Stock Pledge Agreement." In the second document, the two men agreed personally to guarantee loans made by the Pension Trust to Republic and RAD, accepting responsibility for "all sums which may be presently due and owing and of all sums which may in the future become due and owing." We shall refer to this agreement as the "Guarantee."

Two additional agreements were signed by the five other shareholders of Republic and RAD. In what we shall term the "Guarantor Indemnity Agreement," the signers agreed to "indemnify and save harmless" Theodore Libby and Michael Feinstein against loss suffered by them in connection with guaranteeing loans made by the Pension Trust to Republic and RAD in proportion to each of the seven shareholders' percentage ownership of Republic Pipe. This agreement apparently sought to reallocate to the full group of stockholders whatever liability Theodore Libby and Michael Feinstein suffered as the result of their direct guarantee of the company loans. The record does not reveal why all seven shareholders did not simply sign the Guarantee, or how it was decided that Michael Feinstein and Theodore Libby would assume that obligation.

In the fourth document, which we refer to as the "Save Harmless Agreement,"[1] the five signers agreed to "indemnify and save harmless" Harris Libby, Michael Feinstein, and Ernest Singer—the Pension Plan trustees at that time—against "any losses suffered by [the Plan] resulting from loans made by said Trustees to [Republic Pipe and RAD]."

In 1973 the Feinstein group bought all the outstanding shares of Republic stock owned by Theodore Libby, Harris Libby, and Ernest Singer. The three men resigned their positions as officers and directors, and Harris Libby and Ernest Singer also resigned as trustees of the Pension Trust. On July 2, 1973, Michael Feinstein, as president of Republic, signed another indemnity agreement in which Republic agreed to "indemnify and hold harmless the Former Stockholders [Harris Libby, Theodore Libby, Ernest Singer, and Arthur Zanditon[2]] of and from any claim against Republic on which the Former Stockholders may now or at any time hereafter be liable, to the end that no one of the Former Stockholders shall ever be called upon personally to make good on any such obligation." In May 1974, the Feinstein group bought the shares owned by Zanditon and his wife, giving the Feinsteins 100 percent ownership of Republic. Gerald Feinstein and Robert Bonin, a lawyer whose connection to the company owners is not revealed by the record, replaced Ernest Singer and Harris Libby as trustees of the Pension Trust. No document was executed between the Pension Trust and Theodore Libby terminating either his stock pledge or his personal guarantee of the Pension Trust's loans. Nor were documents signed by the Pension Trust with the other Libby Group members to terminate their obligations under the Guarantor Indemnity Agreement or the Save Harmless Agreement.

---

1. This is the terminology adopted by the district court. The Libbys refer to this document as the "Trustee Indemnity Agreement." To avoid characterizing the document we shall use the district court's term.

2. Arthur Zanditon was included in this indemnification although he did not sell his stock until the following year.

Republic filed a petition under Chapter XI of the Bankruptcy Act in September 1975. In March 1977, the Pension Benefit Guaranty Corporation (PBGC), a wholly owned United States government entity charged with enforcing the provisions of Title IV of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1301–1461 (1982), entered into an agreement with the Pension Trust administrator to terminate the plan as of March 6, 1976 and to appoint PBGC permanent statutory trustee of the Plan. *See* 29 U.S.C. §§ 1341(e), 1342(c), and 1348(a)(1). The Republic and RAD loans, totalling $113,-542.64, remained unpaid.

### B.

In December 1975, Arthur Zanditon filed a complaint against Michael Feinstein, Gerald Feinstein and Robert Bonin, the then-trustees of the Pension Trust, seeking pension benefits allegedly due him. Zanditon later amended his complaint to seek recovery of the benefits directly from the PBGC. In February 1980, the PBGC filed a separate suit against Republic Pipe, RAD, and the seven individuals who had shared ownership of the companies until 1973, seeking repayment of the two loans that originally had been made in 1966. The PBGC alleged that the individual defendants were liable for the loan based on one or another of the documents executed on June 1, 1966, or based on a breach of fiduciary duty as Pension Plan trustee. Zanditon's and the PBGC's suits were later consolidated.

The PBGC's complaint stated five claims for relief. The first, against Theodore Libby and Michael Feinstein, sought to collect on the Guarantee, in which Libby and Feinstein personally had guaranteed payment to the Pension Trust of all sums presently or in the future due and owing to the Pension Trust from Republic Pipe and RAD. The second claim, against the other five owners of Republic Pipe, sought to collect on the Save Harmless Agreement, in which Harris Libby, Ernest Singer, Arthur Zanditon, Sheldon Feinstein and Gerald Feinstein agreed to indemnify and save harmless the three then-trustees of the Pension Trust (Harris Libby, Michael Feinstein and Ernest Singer) from any losses resulting from loans made to Republic Pipe and RAD.[3]

PBGC's third and fifth claims were dismissed by the district court and are not part of this appeal. The fourth claim did not directly apply to the Libby Group. It sought recovery under ERISA from Michael Feinstein, Gerald Feinstein and Robert Bonin—the trustees of the Pension Trust when the final loan renewals took place in January 1975—for allegedly breaching their fiduciary duties as trustees by authorizing the renewal of the loans.

The district court found for the PBGC on its first two claims and on its ERISA claim against Gerald Feinstein. The court granted summary judgment for defendant Bonin on the PBGC's claim for breach of fiduciary duty. The court ruled that the liability of all persons against whom judgment had been rendered was joint and several and that each person had a right of contribution against the others.

Because of the procedural posture of the consolidated cases and deaths among the parties,[4] the court's judgment meant the following: (1) on Claim 1, Theodore Libby was found liable in the full amount of the outstanding loans, $113,542.64, plus interest; (2) on Claim 2, Gerald Feinstein, Diane Feinstein as executrix of Sheldon Feinstein's estate, Ernest Singer, Arthur Zanditon, and Harris Libby were found liable, jointly and severally, in the full amount of the outstanding loans, plus interest; and (3) on Claim 4, Gerald Feinstein was found liable for the full amount, plus interest and attorney's fees, based on a breach of fiduciary duties imposed upon him as trustee under ERISA.[5]

---

3. Although it seems odd, the Trustee Indemnity Agreement was, in fact, signed by Harris Libby and Ernest Singer while it also purported to indemnify those two. *See infra* at 701.

4. In January 1986, the court dismissed all claims against Michael Feinstein, who had died.

5. In Zanditon's separate action, CA No. 87–1474, the district court found for plaintiff Zanditon against defendant Gerald Feinstein in the

In this appeal the Libby Group challenges the district court's judgment on Claims 1 and 2, contending primarily that the 1966 agreements expired when they sold their stock and withdrew from the company in 1973 and 1974.[6] The Libbys also claim that the court erroneously found that the Save Harmless Agreement was a guarantee, rather than an instrument of indemnity, and further erred in ruling that that document ran to and was enforceable by the PBGC. In addition, the Libby Group claims the court erred in dismissing the PBGC's breach of fiduciary duty claims against Robert Bonin.[7]

## II. *The Guarantee*

We turn first to the PBGC's claim that the Guarantee remained valid and enforceable against Theodore Libby even after his departure from Republic Pipe in 1973. Massachusetts law provides that a guarantee of unspecified duration shall be deemed enforceable at least for a reasonable time, and that the period of enforceability "must be determined from all the circumstances according to the reasonable inferences presumably entertained by normal business men." *Zeo v. Loomis,* 246 Mass. 366, 368, 141 N.E. 115, 116 (1923); *Amsco, Inc. v. Foze,* 8 Mass.App. 796, 797–98, 397 N.E.2d 1146, 1147 (1979). *See also Merrimack Valley National Bank v. Baird,* 372 Mass. 721, 723–24, 363 N.E.2d 688, 690 (1977) (when guaranty contract is ambiguous, parties' intent determined by looking at "guaranty's terms and the circumstances surrounding its creation, such as relationship of the parties, actions of the parties and established business usages").

The district court found it unnecessary to consider the surrounding circumstances in this case because it concluded that the "broad and inclusive" language of the Guarantee plainly meant that it embraced all present and future loans from the Pen-

sion Trust to Republic and RAD. We recite the relevant language:

> For VALUE RECEIVED we, [Michael Feinstein and Theodore Libby] jointly and severally, hereby guarantee the payment to HARRIS B. LIBBY, MICHAEL B. FEINSTEIN, and ERNEST A. SINGER, as they are Trustees [of the Plan] ... of all sums which may be presently due and owing and of all sums which may in the future become due and owing, to said Trustees from [Republic and RAD] ... and we guarantee the due performance by the borrowers [Republic and RAD] of all its obligations under all present and future loan agreements between the borrowers and the lender.

Under Massachusetts law, the interpretation or construction of contracts and other written documents is ordinarily an issue of law for determination by the court. *Edmonds v. United States,* 642 F.2d 877, 881 (1st Cir.1981); *Sands v. Arruda,* 359 Mass. 591, 595, 270 N.E.2d 826, 829 (1971). We therefore give plenary review on appeal to the district court's judgment that the Guarantee on its face extended beyond the Libby group's tenure with Republic Pipe. *RCI Northeast Services Division v. Boston Edison Co.,* 822 F.2d 199, 202 (1st Cir.1987).

Our conclusion is that the wording of the Guarantee is not clear and unambiguous. The district court relied on the language referring to "all sums which may in the future become due and owing" to conclude that the guarantee was perpetual and, unless specifically revoked, covered any loan ever made by the Pension Trust to Republic and RAD. We do not believe this language clearly states the signers' intent to be liable forever no matter what changes in circumstances might occur. Rather, this open-ended language appears to us simply to designate this agreement as a "continuing guarantee," meaning that it

---

amount necessary to indemnify Zanditon against loss in the PBGC suit.

**6.** Zanditon is not a party to the Libbys' appeal regarding the duration of the Guarantee.

**7.** The Libby Group's interest in this issue stems from the district court's decision that liability

would be joint and several among the various defendants against whom judgment had been rendered. If Bonin were found to share liability, the Libbys would have contribution rights against him. Zanditon did not join this aspect of the appeal.

was applicable not only to the loan about to be made in 1966 but for future loans as well. *See* 38 Am.Jur.2d *Guaranty* § 23 (1968). What the language does not specify is a termination point for this continuing obligation. The promise to back up all present and future loans made by the Pension Plan to Republic and RAD is no more precise a statement of duration than the guarantee provision in *Zeo v. Loomis*, 246 Mass. at 367, 141 N.E. at 115, which read: "I hereby guarantee the payment of all bills contracted with you by Peter Loomis." The *Zeo* guarantee was construed to lack a specification of duration.

The difference in language that exists when a contract *does* contain a termination point can be seen in *Manufacturers' Finance Co. v. Rockwell*, 278 Mass. 502, 504, 180 N.E. 224, 225 (1932), where the guarantee stated: "[T]he liability hereunder ... shall continue until said [company] receives written notice revoking said liability as to future transactions." The Guarantee here had no similar specific trigger of termination; indeed, both the district court and the PBGC seem to agree that there was no explicit duration to the obligation assumed in the Guarantee.[8] The district court therefore misconstrued the Guarantee to specify, *on its face*, that it remained enforceable to the present time and, under Massachusetts law, we must instead look to the surrounding circumstances to determine its duration.

The district court also held, however, that even if the document were deemed ambiguous, the evidence demonstrated the parties' intent at the time of signing that the Guarantee would continue in force "unless and until it was revoked." Since there was no explicit revocation, the court held that Theodore Libby remained liable even after his departure from Republic Pipe. We must accept the district court's conclusion on this factbound question unless we find that it is clearly erroneous. *RCI Northeast Services Division*, 822 F.2d at 201–02.

We can not say the district court clearly erred in finding that the Guarantee survived the Libbys' withdrawal from the company, although we reach that conclusion by means of a different analysis. Under Massachusetts law, we believe we must make one of two determinations when considering a non-specific guarantee such as the one before us. First, we need to decide whether there is evidence outside the document of the parties' intent with regard to the length of the Guarantee. Second, if there is no evidence, or inconclusive evidence, of intent, we need to decide what would be a "reasonable time" for the operation of this Guarantee. *Zeo*, 246 Mass. at 368, 141 N.E. at 116 ("It may be assumed that at least the guaranty was intended to be operative for a reasonable time.") We therefore turn to these determinations, considering first whether there is evidence of the parties' intent.

We are convinced that Theodore Libby gave no thought in 1966 to the duration of the Guarantee. Republic Pipe always had been in the Libby and Feinstein families, and it seems likely that the company owners in 1966 assumed that those two families would continue to own the company in perpetuity. It appears that Theodore Libby in 1966 assumed he would remain a guarantor throughout the life of the loans about to be made by the Pension Trust to Republic and RAD, but that he also assumed he would be a guarantor only so long as he had an ownership interest in Republic Pipe. In 1966, the life of the loans would have appeared to have been subsumed within the longer period of the Libbys' ownership interest in Republic Pipe. For that reason, it is not surprising that the other agreements signed in 1966 reflect an assumption that the guarantors also are company owners.

It is at least in part on the basis of the other agreements that Theodore Libby argues that his intent in 1966 was that his guarantee was to be coincident with, and limited to, his tenure as an owner of Republic Pipe. He points specifically to the

---

8. Appellee PBGC notes in its brief that neither the Guarantee nor the Save Harmless Agreement "states any limitation as to time nor condition on the performance of the signatories." Appellee's Brief at 23.

Guarantor Indemnity Agreement, which apportioned any liability that would fall on the two guarantors among the seven shareholders according to their stock ownership in the company. Thus, he asserts that liability was linked to company ownership, and specifically to the extent of that ownership. The problem with drawing intent from the content of the other 1966 documents, however, is that those agreements almost certainly assumed a fact—the Libbys' permanent ownership of Republic Pipe—that turned out to be incorrect.

Moreover, to the extent that the Pension Plan trustees can be assigned an "intent" in 1966, we think it likely that that intent would have been for the guarantors to remain liable at least until the loans about to be made were paid off. Certainly, the Pension Trust would not in 1966 have accepted the notion that *both* of its guarantors could release themselves from the Guarantee simply by selling their interests in the company.[9] But that is, in effect, what the Libbys ask us to accept.

Nor do we find the 1973 Indemnity Agreement helpful in revealing the parties' intent in 1966. The fact that, in 1973, Michael Feinstein agreed to relieve Theodore Libby of his obligations when Libby left the company does not show that the Guarantee's duration originally was intended to be limited to the signers' tenure with Republic Pipe. The 1973 document does not refer directly to the Guarantee or to any of the other 1966 agreements, and expressly indemnifies the Libbys only against claims filed against *Republic.* We do not see how the 1973 Indemnity Agreement's silence on the subject of the 1966 agreements reveals the parties' intent as to the duration of the earlier documents.[10]

We therefore conclude that there is insufficient evidence of the parties' intent with regard to the duration of the Guarantee to allow us to reach a decision on that basis. As a result, we must turn to consider the "reasonable time" for the operation of this Guarantee. This is not an easy question. The Libbys make a strong case for the argument that their liability reasonably should have ended when they left Republic Pipe. As owners, they participated in the operation of the company and had some control over its finances. Indeed, William Sapers, who served as consultant to the Pension Fund, testified that the company's handling of the loans changed after the Libbys left the company, with record-keeping deteriorating and less interest expressed in maintaining sufficient collateral. In addition, after the Libbys' departure, the copper pipe collateral was found to be missing. When the Libbys left, Republic Pipe was solvent, and there was no apparent risk that the company would be unable to pay off the loans. Moreover, the loans outstanding when the Libbys left in mid-1973 were at least in theory "paid off" and a deliberate decision to renew them was made the following year without the Libbys' participation. The Libbys argue that these facts make their departure from the company the logical termination point for their liability under the Guarantee and the other 1966 documents.

Although these facts do make withdrawal from the company the reasonable point of termination for the 1966 agreements *from the Libbys' perspective,* we reject the suggestion that the Guarantee should be deemed legally terminated simply because that is when it would be best for the guarantors. Under Massachusetts law, the Libbys' withdrawal from the company does not by itself trigger the expiration of their personal guarantees. In *Manufacturers' Finance Co. v. Rockwell,* 278 Mass. 502,

---

**9.** It could be argued that the Pension Trust representatives—Michael Feinstein, Harris Libby and Ernest Singer—were in fact unconcerned about the strength and longevity of the Guarantee. However, the intent in 1966 appeared to be to legitimize as much as possible the questionable loans being made by a pension fund to its sponsoring company, and we therefore think it appropriate to attribute to the Pen-

sion Fund trustees at that time the intent to secure a guarantee with some force behind it.

**10.** The Libbys do not argue that the 1973 agreement modified or unilaterally abrogated the Guarantee. We therefore do not address the question whether that agreement effectively terminated the Libbys' liability under the 1966 agreements.

180 N.E. 224 (1932), the defendant-guarantor had resigned as an officer of the borrowing company and disposed of all stock he held in it. The Massachusetts court held that the guarantee's requirement of written notice of revocation was not met by the defendant's written notice of resignation as president and director of the company. The court noted that the defendant's liability as guarantor was not conditioned by his status as an officeholder or stockholder in the company, and thus would not automatically expire when he withdrew from those positions. Although in this case there is no required written notice to terminate the guarantee, the *Rockwell* case is applicable here to the extent that it holds that personal liability is not necessarily extinguished when the business relationship between the guarantor and guaranteed company ends. Thus, the fact that the Libbys' control over Republic Pipe and its finances ended when they left the company does not necessarily lead to the conclusion that the Guarantee reasonably operated only until that time.

 We consider particularly significant the district court's finding that neither of the two original loans made in the 1960s was ever paid off. Although paper was exchanged every year and notes were marked "paid," the loans were in fact simply rolled over. The court found that Republic Pipe never paid any principal on its loan, and that RAD paid only a negligible amount of principal. Thus, the loans that presumably were the original reason for the Guarantee remain unpaid. For the Guarantee to have had any meaning when it was signed, we believe the guarantors must at least be held to their promise for the duration of the original transaction executed under it. If the Guarantee is not deemed to last at least this long, the Libbys and Feinsteins presumably could have sold

Republic Pipe immediately after obtaining the original loans and left the Pension Trust without a guarantor. We do not believe "normal business men" would consider this reasonable. We therefore conclude that, "according to the reasonable inferences presumably entertained by normal business men," *Zeo*, 246 Mass. at 368, 141 N.E. at 116, in the absence of an express revocation to which the creditor consents,[11] the Guarantee should be assumed to be operative at least until the original loan guaranteed is paid off. The district court therefore correctly held that Theodore Libby remained liable on the Guarantee even after his departure from Republic Pipe.

### III. *The Save Harmless Agreement*

We next turn to the Save Harmless Agreement. The Libby Group claims the district court erred in construing that document as a guarantee enforceable by the PBGC and in ruling that it survived the Libbys' departure from Republic Pipe. We begin by considering the nature of the agreement.[12] The relevant language is as follows:

> NOW, THEREFORE, for consideration paid to each of the undersigned, the undersigned does hereby agree to indemnify and save harmless the said Harris B. Libby, Michael B. Feinstein and Ernest A. Singer as they are Trustees of the Republic Pipe & Supply Corp. Pension Trust against any losses suffered by said Pension Trust resulting from loans made by said Trustees to Republic Pipe & Supply Corp. and Republic Appliance and Distributors Corp.

The document was signed by Arthur Zanditon, Ernest Singer, Harris Libby, Sheldon Feinstein, and Gerald Feinstein. Only Michael Feinstein and Theodore Libby, the

---

**11.** The lender's substitution of a replacement guarantor would serve as evidence of consent to revocation even in the absence of an express statement of revocation by the original guarantor. *Amsco, Inc. v. Foze*, 8 Mass.App. 796, 397 N.E.2d 1146 (1979).

**12.** A guarantee is a secondary liability in which the guarantor, as a third party, agrees to secure the primary obligation between the creditor and the debtor. The obligation in a guarantee runs from the guarantor directly to the creditor. In a contract of indemnity, the promisor agrees to "indemnify" the debtor personally against loss, creating a primary liability between the debtor and the promisor. 38 Am.Jur.2d *Guaranty* § 17 (1968).

two guarantors, did not sign this agreement.

■ Initially, we point out that the district court correctly observed that use of particular terminology alone does not determine whether a document is an indemnity or a guarantee. 38 C.J.S. *Guaranty* § 5 (1943) ("Whether a contract is one of guaranty or of indemnity is determined, not by the formal words used, but by the nature of the transaction as determined in its setting...."); 38 Am.Jur.2d *Guaranty* § 5 (1968). Thus, the phrase "indemnify and save harmless," which appears in the document, does not by itself reveal the nature of the signers' undertaking.

Appellants contend that the district court erred in concluding that this document was a guarantee, rather than an indemnity, because the court failed to consider the agreement in context. They emphasize that the Save Harmless Agreement was merely part of an integrated set of documents executed for the dual purposes of guaranteeing repayment of the Pension Trust loans and of allocating any personal liability imposed on the guarantors or trustees proportionately among all seven Republic Pipe stockholders. They claim, therefore, that we must ascertain the nature of this agreement by considering its purpose in light of the language and purposes of the other three documents.

We agree with appellants that it is appropriate to look at the context in which the Save Harmless Agreement was signed in order to determine its meaning. Massachusetts precedent indicates that when an element of ambiguity exists in a document that is part of an integrated transaction involving multiple documents, the group of writings may be considered together in order to ascertain the meaning of one of the individual writings. *See Phoenix Spring Beverage Co. v. Harvard Brewing Co.*, 312 Mass. 501, 505, 45 N.E.2d 473, 476 (1942) ("It is a general rule that when several writings evidence a single contract between the parties, they will be read together in order to arrive at an interpretation of the contract."); *Shea v. Bay State Gas Co.*, 383 Mass. 218, 222–23, 418 N.E.2d 597, 600 (1981) (" '[c]ontract interpretation is largely an individualized process, with the conclusion in a particular case turning on the particular language used against the background of other indicia of the parties' intention.' " "We therefore 'construe the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished.' ") (citations omitted); *Glick v. Greenleaf*, 383 Mass. 290, 296, 419 N.E.2d 272, 276 (1981) ("When an element of ambiguity appears in a written instrument, we consider the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms."). This emphasis on context is, as noted above, particularly important when the task is to distinguish between often-confused instruments such as a guarantee and an indemnity.

■ Several factors persuade us that the district court clearly erred in failing to find that this document was intended as a personal indemnity to the Plan trustees.[13] First, to construe the Save Harmless Agreement as a guarantee is to ignore the differences in language between that document and the one actually labeled as a Guarantee. We think it illogical to conclude that the same individuals in one document would have used guarantee language and in another executed at the same time would have used indemnification language, while having the same goal in mind for each agreement. Why would the company owners have drafted a separate document with different terminology when they could just have added the other five names to the Guarantee document?

Second, it seems clear that the parties intended to allocate the personal liability for the loans among the then seven owners of Republic Pipe. The Guarantor Indemnity Agreement unambiguously redistributed the obligations imposed, in the first in-

---

**13.** We need not decide whether the indemnity was intended to be for only the three named trustees in 1966 or whether it was meant to extend to any individual serving in the role of trustee. We believe, however, that the latter was the case. *See infra* at 701.

stance, on Theodore Libby and Michael Feinstein through the Guarantee so that each owner would bear his proportionate share of the financial risks associated with the loans. There was no such backup document to the Save Harmless Agreement. Thus, if the Save Harmless Agreement is interpreted as a guarantee, those five signers could have been held liable on the loans—if the PBGC had chosen to sue only on that agreement—and the five would have had no legal means of shifting some of the burden to Theodore Libby and Michael Feinstein. This would frustrate the apparent intent of the parties to equalize the liability.

Third, construing the Save Harmless Agreement as intended to personally indemnify the trustees completes the scheme of shared responsibility for the loans that was one apparent aim of the the four agreements. The Guarantor Indemnity Agreement spread the risk assumed in the Guarantee by Theodore Libby and Michael Feinstein to all seven owners.[14] Although the Guarantor Indemnity Agreement referred specifically only to the stock pledged by Theodore Libby and Michael Feinstein, it indemnified the two guarantors "against *any* loss suffered by them, including all counsel fees," and so apparently covered both loss of funds and loss of the pledged stock. (Emphasis added.) The only remaining risk associated with the loans that could be imposed on a small number of company owners that was not covered by the Guarantor Indemnity Agreement was the personal financial liability that could be imposed on the Pension Plan trustees *as trustees*. The Save Harmless Agreement seems to be the attempt to apportion that risk, too.

We recognize that at least two factors arguably support reading the Save Harmless Agreement as a guarantee rather than an indemnity. First, both Harris Libby and Ernest Singer signed the Save Harmless Agreement, meaning that they were on both sides of the agreement because they were serving as plan trustees at the time. This oddity might be understandable if the document were viewed as a guarantee; the signers could be seen as contracting with the Pension Plan rather than with the trustees as individuals. Another plausible explanation, however, is that the Save Harmless Agreement was intended to run to any plan trustee, not just to those serving in that role at that time. Thus, Harris Libby and Singer needed to sign the Agreement in the event other company owners assumed their roles as trustees. Similarly, Harris Libby and Singer may have signed the Save Harmless Agreement to be sure that, in the event one or the other resigned his position, the remaining trustee would be able to look to the former trustee for indemnification.

A second basis for plausible argument that the Agreement was intended as a guarantee is that neither Theodore Libby nor Michael Feinstein signed it. This omission would be understandable if the document were viewed as a guarantee because those two would be covered by the document specifically designated as a Guarantee. We think it likely, however, that Theodore Libby and Michael Feinstein were not included in the Save Harmless Agreement because they assumed the primary burden of the Guarantee and Stock Pledge Agreement and, indeed, actually made a contingent conveyance of their stock. Although the Guarantor Indemnity Agreement apportioned any liability imposed on Theodore Libby and Michael Feinstein among all the shareholders, it nevertheless may be that the shareholders perceived those two as burdened by greater risks as the primary obligors and, for that reason, excluded them from sharing the trustee liability. We therefore conclude that neither of these two factors weighs significantly against a conclusion that the Save Harmless Agreement was intended as a personal indemnity for the benefit of the Pension Plan trustees.

■ We further conclude that the indemnity is not enforceable by the PBGC, as the

---

**14.** This could be one reason why Michael Feinstein represented to the IRS in about 1972 that all seven owners had guaranteed the loans made by the Pension Trust, and why Gerald Feinstein testified that he believed there was "a personal guaranty of the owners of the company and the former owners of the company securing the loans."

present trustee for the Pension Plan. Our prior discussion demonstrates that the document was intended as a mechanism for dividing, among the owners of Republic Pipe, any personal liability imposed on the trustees arising out of their roles as trustees. The PBGC has no such personal liability.[15]

### IV. *The Summary Judgment for Bonin*

■ The PBGC's fourth claim alleged that Gerald Feinstein and Robert Bonin had breached their statutory fiduciary duties as trustees of the Pension Trust by allowing the renewal of the loans on January 2, 1975. The district court granted summary judgment in favor of Bonin, who served as trustee from July 2, 1973, until at least January 15, 1975. The Libby group asks us to review the judgment for Bonin because the district court's decision deprives them of their contribution rights against him.[16] Bonin argues that the Libbys have no standing to appeal the judgment for him because they never asserted any claims against him in the district court. The PBGC, the plaintiff against Bonin in the district court, has not filed an appeal.

We decline to review the district court's summary judgment for Bonin. We find it unnecessary, however, to decide whether the Libbys lack standing to appeal that judgment. We instead invoke a principle that we consider more obviously applicable to the facts of this case: a matter not brought to the attention of the district court may not be raised for the first time on appeal. *See Clauson v. Smith,* 823 F.2d 660, 666 (1st Cir.1987); *Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir.1979). The Libbys neither filed a response to Bonin's motion for summary judgment, nor sought reconsideration by the district court after the judgment had been granted. Whether or not the Libbys thought the trial court would change its mind based on their arguments concerning Bonin's liability, the Libbys should have made their claim in the first instance to that court. We find no reason to excuse their failure to do so in this case. *See Whyte v. Connecticut Mutual Life Ins. Co.,* 818 F.2d 1005, 1009 (1st Cir.1987) (this rule " 'is relaxed only in "horrendous cases when a gross miscarriage of justice would occur" ' "). We therefore affirm the district court's summary judgment for Bonin.

Bonin's request for attorney's fees and costs is denied.

*The judgment against Theodore Libby based on the Guarantee is affirmed; the judgment against Ernest Singer, Arthur Zanditon and Harris Libby based on the Save Harmless Agreement is reversed; the summary judgment in favor of Robert Bonin is affirmed.* No costs on appeal.

---

**15.** We need not consider whether the indemnity would be enforceable by an individual trustee who *was* found personally liable but who was not named in the document.

Our disposition also makes it unnecessary to consider the duration of the Save Harmless Agreement.

**16.** Our decision that the Save Harmless Agreement is not a guarantee enforceable by the

PBGC means that only Theodore Libby has an interest in this appeal in securing contribution from Bonin since the judgment against Ernest Singer, Arthur Zanditon and Harris Libby must be reversed. Bonin's liability would again be relevant to Singer, Zanditon and Harris Libby, however, if Theodore Libby seeks to enforce the Guarantor Indemnity Agreement against them.