In re **NAVIGATION TECHNOLOGY CORPORATION, Debtor.**

**Victor W. DAHAR, Trustee, Plaintiff, Appellee,**

v.

**RAYTHEON COMPANY, Defendant, Appellant.**

**No. 88–1981.**

United States Court of Appeals, First Circuit.

Heard Feb. 8, 1989.

Decided Aug. 1, 1989.

delay, and single or double costs."

Evan K. Kaplan, Lexington, Mass., with whom R. Joseph D'Avignon, Office of the General Counsel, Raytheon Company, was on brief, for defendant, appellant.

Eleanor W. Dahar with whom Victor W. Dahar and Victor W. Dahar, P.A., Manchester, N.H., were on brief, for plaintiff, appellee.

Before BOWNES, Circuit Judge, COFFIN, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

COFFIN, Senior Circuit Judge.

This appeal concerns a dispute over royalties sought by Victor W. Dahar, Trustee in Bankruptcy, on behalf of Navigation Technology Corp. (Navtec). In a 1978 License Agreement, Navtec authorized the defendant, Raytheon Corp., to produce and market the "Loran C," an electronic navigation device for boats. The agreement provides generally that Navtec was to receive a royalty for each unit of the Loran C sold by Raytheon. The parties dispute the basis on which royalties are computed under the terms of the agreement. Raytheon argues that the Trustee is without standing to pursue his claim, and that in any event it has paid all royalties due under the agreement.

## I. Background

The U.S. Bankruptcy Court for the District of New Hampshire held a hearing on the Trustee's claim against Raytheon. The court implicitly rejected Raytheon's contention that Navtec's assignment of rights under the License Agreement to Nashua Trust Co., Navtec's bank, deprived the Trustee of standing. Based on what it described as sketchy evidence, the bankruptcy court held that there was a latent ambiguity in the clause governing royalties in the License Agreement, and it held that the Trustee's interpretation of the provision was correct. The bankruptcy court's

judgment was affirmed by the U.S. District Court for the District of New Hampshire, which explicitly addressed the issue of standing.

## II. The Trustee's Standing.

Raytheon argues that on its face, the assignment of royalties from Navtec to Nashua Trust was "absolute," and that therefore the debtor has no surviving interest in the royalties to sustain an action by the Trustee. Raytheon points to its written acknowledgment of the assignment as support for this position.

While the determination that the Trustee has standing is a question of law subject to review under a de novo standard, not the "clearly erroneous" standard enunciated in the district court's memorandum opinion, whether the assignment created a security interest is a mixed question of law and fact. Because security interests often serve to notify third parties of the secured party's interest in property, the Uniform Commercial Code requires a written "security agreement," N.H.Rev.Stat.Ann. (RSA) § 382–A:9–203 (1988 Supp.), defined as "an agreement which creates or provides for a security interest." RSA § 382–A:9–105.

> In disputed cases, the conjunction of 9–203 and 9–105 may call for two independent inquiries. The court may be called upon first to resolve, as a question of law, whether the language embodied in the writing objectively indicates that the parties may have intended to create or provide for a security interest.... [I]n problem cases, the writing may barely meet the objective test and no more, leaving for further factual inquiry the question whether the parties also actually intended to create a security interest.

J.J. White & R. Summers, *Uniform Commercial Code* § 24–3 at 299–300 (3d ed. 1988) (footnotes omitted). *See also In re Joseph Kanner Hat Company,* 482 F.2d 937, 939–40 (2d Cir.1973).

The wording of the assignment clearly supports the determination that it served as security for money loaned by Nashua Trust to Navtec:

> To secure the payment of Bank debt, the Assignor [Navtec] hereby assigns and transfers to the Bank all accounts and Contract Rights arising under the Contracts [the License Agreement] [and] the proceeds thereof ...; but no security interest in goods in favor of the Bank shall arise hereunder in any case where such interest would conflict with any title to or lien upon the goods in favor of the United States of America....

The assignment itself indicates that it serves "To secure the payment of Bank debt," and this is generally seen as sufficient to establish a security agreement. White & Summers at 301 ("Even unorthodox documents containing words such as ... 'to secure,' 'security,' [or] assignment language ... are likely to be upheld as adequate security agreements, even when not explicitly labeled as such."). The assignment's function as a security is further supported by testimony by Navtec's former president, Jeffery W. Perkins, that it was undertaken as part of an ongoing financial relationship with the bank, that it served to secure a Small Business Administration loan acquired through the bank, and that receipts under the assignment were credited to Navtec's account. *See In re Hurricane Elkhorn Coal Corp.,* 19 B.R. 609, 616 (Bankr.W.D.Ky.1982), *aff'd in part and rev'd in part,* 32 B.R. 737 (Bankr.W.D.Ky. 1983), *aff'd,* 763 F.2d 188 (6th Cir.1985); *In re Joseph Kanner Hat Company,* 482 F.2d at 940; *Matter of Candy Lane Corp.,* 38 B.R. 571, 577 (Bankr.S.D.N.Y.1984); *In re O.P.M. Leasing Services, Inc.,* 30 B.R. 642, 646–48 (Bankr.S.D.N.Y.1983). The "absolute" nature of an assignment does not preclude its service as a security agreement. *In re Joseph Kanner Hat Company* at 940; *Wambach v. Randall,* 484 F.2d 572, 575 (7th Cir.1973) (citing UCC § 9–203 comment 4). Since the assignment is a legally sufficient writing, and since the bankruptcy court's finding that the assignment was in fact intended as a security agreement is not clearly erroneous, we do not disturb the court's determination that the assignment was as a security. Raytheon can therefore prevail on its standing

argument only if a trustee in bankruptcy lacks standing as a matter of law to seek payments due on contract rights that the debtor has assigned as security for a bank loan.

■ Raytheon argues that the Trustee lacks standing to pursue such a claim based on *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972). In *Caplin*, the trustee brought an action on behalf of the debtor's bondholders. The Supreme Court held that the trustee lacked standing to bring such action primarily because the Bankruptcy Act, 11 U.S.C. § 75 (1970), *replaced by* 11 U.S.C. § 704, authorized the trustee only to "collect and reduce to money the property of the estate for which" he is trustee. *Id.* The Court further considered the policy implications of trustee standing to pursue claims on behalf of third party creditors such as the bondholders in *Caplin.* 406 U.S. at 431–34, 92 S.Ct. at 1686–88. Because third party creditors could bring their own actions, and because actions brought by the trustee would complicate matters, likely lead to separate suits by bondholders not content with the trustee's advocacy, and raise problems of res judicata, the Court did not favor such trustee standing. *See also Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1514–16 (1st Cir.1987).

Although Raytheon frames its argument on the assumption that the trustee is trying to assert the interest of the absent bank, the fact remains that, because there might be a surplus of royalty payments belonging to the estate after the bank's debt has been paid, the Trustee is merely asserting the estate's interest. We are satisfied that under New Hampshire law, a party assigning contract rights to secure a debt maintains a

property interest in those rights. *See* RSA § 382–A:9–504(2) ("If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency"). The Trustee's suit against Raytheon is therefore properly viewed as an effort to reduce to judgment claims of the debtor estate, and is expressly authorized by the Act. Being so authorized, we will not deny standing under *Caplin* absent compelling countervailing considerations.

■ Focusing on the res judicata aspect of *Caplin*, Raytheon asserts that the Trustee has no standing because Nashua Trust would not be bound by the result of the Trustee's action. But the mere possibility that the bank will not be bound by the outcome is not sufficient to deny the Trustee standing in this case. Based on representations by the Trustee that he represents the bank's interest, substantially corroborated by Nashua Trust's attorney,[1] it appears likely that Nashua Trust will be bound by the result of the Trustee's action. While formal joinder or a written stipulation agreeing to be bound are preferable means to establish it, the record suffices to demonstrate the bank's consent to the Trustee's representation of its interests, and its agreement to be bound by the outcome. *Restatement (Second) of Judgments* § 40 and comment a, at 390 (1982) ("An agreement to be bound by the result of another action may be express; it also may be implied from conduct and manifestations of intention."). *See also id.* § 41(1)(b) (1982) (Person Represented by a Party); *id.* § 62 (Conduct Inducing Reliance on an Adjudication).[2]

In sum, we conclude the Trustee has standing as a matter of law based on factu-

---

1. In a belated attempt to join the Trustee's suit, during defendant's motion for reconsideration several weeks after the hearing and the court's judgment, a representative of the bank indicated that the bank had consented to the Trustee's action, and had made an arrangement to share the proceeds, if any, of a favorable judgment. The bankruptcy court denied the bank's motion to intervene as untimely and unnecessary.

2. Alternatively, Nashua Trust's agreement to split the proceeds of the Trustee's action can be seen as a contingency fee. Through this arrangement, the bank has helped finance the Trustee's suit. Persons who are not named parties but who finance a suit may, in proper circumstances, be bound by the outcome. *See Kartell v. Blue Shield of Massachusetts, Inc.*, 687 F.2d 543, 552 (1st Cir.1982); *General Foods v. Massachusetts Dep't of Pub. Health*, 648 F.2d 784, 787–88 (1st Cir.1981).

al findings of the bankruptcy court which are supported by the record and not clearly erroneous.

### III. Royalties Under the License Agreement

Paragraph 5.2 of the Licensing Agreement provides:

As to each unit of Licensed Equipment made by, made for, used, sold or leased by LICENSEE under this Agreement, LICENSEE agrees to pay to LICENSOR a royalty on the basis stated in Appendix B (attached hereto and made a part hereof) [providing for a three percent royalty on net sales]. Royalty payments made on Licensed Equipment returned to Licensee for credit by a purchaser shall be credited against future royalty payments. A royalty payment shall be paid only once for each unit of Licensed Equipment made regardless of where made.... LICENSOR hereby agrees that LICENSEE will not be obligated to pay royalties on Licensed Equipment purchased from Licensor.

Paragraph 2.2 of the agreement defines "Licensed Equipment" as:

All equipment, products and devices with improvements required to manufacture Marine LORAN C Systems ... including without limitation the equipment specified in Specification No. 982338 and subsequent revisions (incorporated herein by reference), and built in accordance with the Proprietary Know–How.

The Trustee admitted that Raytheon purchased from Navtec more than $1 million of components listed in Specification No. 982338, which Raytheon then used to assemble the Loran C. Raytheon claims that the last sentence of ¶ 5.2 of the License Agreement, *supra*, permits it to deduct the cost of these components from the base for computing royalties.

Raytheon argues that the bankruptcy court ruled in the Trustee's favor on the theory that the parties modified the License Agreement when Raytheon made, and Navtec accepted, payments without a set-off for components. Though the court may have discussed it from the bench, its

judgment does not focus on modification. Both the bankruptcy and district courts, however, did expressly hold that the contract is ambiguous, and that no set-off was originally contemplated. Because it is sufficient to resolve this appeal, we focus the remainder of our discussion on this issue.

■■■ Contractual language is considered ambiguous where the contracting parties reasonably differ as to its meaning. *Commercial Union Assurance Cos. v. Town of Derry*, 118 N.H. 469, 471, 387 A.2d 1171 (1978), *overruled on other grounds, American Home Assur. Co. v. Fish*, 122 N.H. 711, 451 A.2d 358 (1982). The general rule is that whether a contract is clear or ambiguous is a question of law subject to de novo review, *see Triple–A Baseball Club Assocs. v. Northeastern Baseball, Inc.*, 832 F.2d 214, 220 (1st Cir. 1987) (construing Maine law); *Boston Edison Co. v. F.E.R.C.*, 856 F.2d 361, 365 (1st Cir.1988) (construing Massachusetts law); *Zanditon v. Feinstein*, 849 F.2d 692, 696 (1st Cir.1988) (same), and New Hampshire decisions appear to reflect this approach. *See, e.g., Restaurant Operators, Inc. v. Jenney*, 128 N.H. 708, 519 A.2d 256, 258 (1986). If the contract is deemed ambiguous, then the intention of the parties is a question of fact, *id.; MacLeod v. Chalet Susse Int'l, Inc.*, 119 N.H. 238, 243, 401 A.2d 205, 209 (1979), and the bankruptcy court's finding that the original License Agreement did not permit a set-off for components will be set aside only if clearly erroneous. Fed.R.Civ.P. 52(a).

■■■ As recognized by the bankruptcy court early on in the evidentiary hearing, Raytheon's interpretation of the contract is reasonable. The last sentence of ¶ 5.2 provides that Raytheon would pay no royalty on licensed equipment purchased from Navtec. "Licensed Equipment" is specifically defined to include components for the Loran C. Raytheon's explanation that Navtec was to recoup lost royalties through the profit it made on selling components to Raytheon appears plausible, and is consistent with testimony by Raytheon's controller that such is the industry custom.

Though the issue is close, we believe Navtec's understanding of the contract terms is also reasonable. The last sentence of ¶ 5.2 can be understood to indicate that Raytheon was not to pay royalties on any licensed equipment, whether components or testing equipment, *upon the purchase of such items from Navtec.* Under Navtec's interpretation, Raytheon was entitled to purchase licensed equipment "at cost," or at least at a markup not incorporating royalty payments that would be extracted from a non-licensee. This version is supported by Perkins' testimony of the intent of the parties when the agreement was entered into.[3] In addition, there is no directive in the contract for the further step Raytheon proposes; there is no explicit provision that the cost of components purchased from Navtec be deducted from the sales price on which royalties are calculated.

Given the ambiguity of the License Agreement, we cannot say the bankruptcy court clearly erred in preferring Navtec's understanding as the actual one. The record does not compel a finding that Raytheon's failure to set-off component purchases in its first three payments was the result of a clerical error; these payments are competent evidence that the parties originally intended no set-off. Raytheon's argument that we should distinguish between the defined term "Licensed Equipment" and the phrase "unit of Licensed Equipment" is not persuasive, and is undercut by the second sentence of ¶ 5.2 ("Royalty payments made on *Licensed Equipment returned* to Licensee ..." clearly refers to fully assembled *units* of the Loran C). Finally, Navtec's interpretation does not result in double royalties, as Raytheon argues. Instead, limiting application of the last sentence of the royalty provision to transactions involving the purchase of components, with the understanding that full royalties would be due on sale of the com-

pleted unit, appears consistent with the third sentence of ¶ 5.2: "A royalty payment shall be paid only once for each unit of Licensed Equipment made *regardless of where made*" (emphasis added).

### IV. Conclusion

The Trustee has sufficient standing to pursue this claim based on the debtor's residual interest in the royalties due under the License Agreement assigned as security for a bank loan. Moreover, we agree with the district court that the contract is ambiguous. The bankruptcy court found that Navtec's interpretation more likely reflects the actual intentions of the parties. This finding is not clearly erroneous, and we therefore *affirm the decision of the district court* upholding the bankruptcy judgment for the Trustee. *Costs to appellee.*

---

**3.** Perkins testified that:

The royalty was specifically for the sale of the [Loran C] ... for the rights and know-how of that product, and it was over and above the actual cost to Raytheon for the [components] we sold them under a purchase order; completely different.

Since we deem Navtec's interpretation to be reasonable, and since this testimony is consistent with Navtec's reading of the contract, it is not barred by the Parole Evidence Rule but is admissible for purposes of interpretation. *MacLeod,* 119 N.H. 238, 243–44, 401 A.2d 205 (1979); 3 *Corbin on Contracts* § 579.